CHRISTIAN LOOS, Appellant, *v.* THE CITY OF NEW YORK and Others, Respondents.*

Second Department, June 12, 1939.

* Revg. 170 Misc. 14.   See, also, Id. 104.

*Harold R. Medina* [*John Holley Clark* and *Herbert Stern* with him on the brief], for the appellant.

*Jacob I. Goodstein* [*Isidore Zamore* and *Benjamin Wm. Mehlman* with him on the brief], for the respondent North Shore Bus Co., Inc.

*Herman Horowitz* [*William C. Chanler, Corporation Counsel,* and *William Mason Smith, Jr.,* with him on the brief], for the respondents other than North Shore Bus Co., Inc.

*Charles B. Brophy* [*William L. Clay, Jr., Eugene Untermyer* and *Alan Nordlinger* with him on the brief], for the New York World Telegram, Inc., and New York Post, Inc., as *amici curiæ.*

*Emanuel Thebner,* for the Queens County Evening News, Inc., as *amicus curiæ.*

CLOSE, J. This is a taxpayer's action to restrain the operation of certain bus lines in Queens county by defendant North Shore Bus Co., Inc., under a contract with the city of New York, and for judgment declaring the contract illegal and void. The contract in question purports to grant to defendant North Shore Bus Co., Inc. (hereinafter called " North Shore "), a permit under article 5 of the Transportation Corporations Law to operate buses in zone D of the borough of Queens for a maximum period of ten

years, but with the privilege reserved to the city of terminating the privilege and recapturing the operator's property at any time on thirty days' notice.

The following facts appear without substantial dispute: In 1935 the board of estimate and apportionment adopted a resolution dividing the borough into four zones for bus franchise purposes, known as zones A, B, C and D, and identified respectively as the Woodside, Flushing, Ozone Park and Jamaica areas. The board likewise determined that a franchise should be granted to a single operator in each zone, and tentatively adopted a proposed form of contract providing for a franchise for a term of five years, with an additional term of five years during which the contract might be terminated by the city on ninety days' notice. In October, 1936, franchises of this character were granted in zones A, B and C, North Shore being selected as the operator in zone B.

For a number of years a company known as Bee Line, Inc., had been the dominant operator in zone D. A temporary franchise granted to that company had expired in January, 1934. Attempts by the city to arrange for the continued operation of buses in that zone were productive of considerable litigation. (*Bee Line, Inc.*, v. *LaGuardia*, 244 App. Div. 151; *Loos* v. *LaGuardia*, Id. 151; *Clark* v. *LaGuardia*, 245 id. 325; 248 id. 587; affd., 273 N. Y. 639; *Matter of Walsh* v. *LaGuardia*, 245 App. Div. 835; revd., 269 N. Y. 437.) Finally, in 1938, six bus companies, including Bee Line, Inc., and North Shore, applied for the franchise in zone D. In a communication supplementing its petition North Shore offered to enter into the same kind of contract with the city as those already in force in zones A, B and C. Pursuant to a resolution directing a public hearing on the petition of North Shore, the mayor ordered that the petition be advertised in two newspapers — the *Long Island Daily Star* and the *New York World-Telegram*.

Following the public hearing, a form of contract was drafted by the city which differed materially from those previously granted in the other zones of the borough. The principal differences consisted of the following: (1) The word " permit " was substituted throughout for the word " franchise; " (2) it was stated that the contract was made and the recapture provisions were inserted in accordance with the provisions of sections 68 and 69 of the Transportation Corporations Law; and (3) the fixed term was omitted, and provision was made for the termination of the contract by the city at any time on thirty days' notice, with the privilege of purchasing the operator's property, and with a further provision for termination in any event after ten years. Notice of a hearing upon the form of contract was published in the same two news-

papers. On December 8, 1938, the board of estimate adopted a resolution authorizing the mayor to enter into a contract with North Shore, and on December twenty-eighth the contract was executed.

Various charges of fraud, collusion and duress advanced in the complaint have been abandoned by the plaintiff. We are concerned only with the claim that the contract is illegal. It is said in the first place that the city may not lawfully grant a " terminable permit " under article 5 of the Transportation Corporations Law (Laws of 1928, chap. 717, adding §§ 68–69-d), which this contract purports to be, and at the same time provide for a fixed maximum term. We find no merit in this contention. The fixed term contract is authorized by chapter 14 of the New York City Charter. Nothing in the Transportation Corporations Law prevents the city from taking advantage of the charter provision, or from combining the two forms of contract, provided they are not inconsistent. On the contrary, section 69-b of the general statute appears to sanction such practice. The repeal of inconsistent provisions of local charters, contained in section 2 of chapter 717 of the Laws of 1928, is not applicable. In a permit terminable at will, but having a maximum life of ten years, we see no inconsistency.

The three remaining points advanced by the plaintiff are concerned with the procedure to be followed by the city in connection with contracts for the operation of public buses. The procedure is stated with particularity in the various sections of chapter 14 of the charter. The essential steps were stated in condensed form by the Court of Appeals in *Blanshard* v. *City of New York* (262 N. Y. 5); (1) A public hearing shall be held upon the petition therefor. (2) The board of estimate and apportionment shall make inquiry as to the money value of the franchise. (3) The board shall make inquiry as to the adequacy of the compensation proposed to be paid therefor. (4) The board shall embody the result of such inquiry in a form of contract. (5) The board shall hold a public hearing on the proposed contract after public notice.

We are not in sympathy with the plaintiff's contention that in this instance there was no hearing " upon the petition therefor." The argument is based on the fact that the original application was for a " franchise," whereas the contract ultimately granted is described as a " permit; " and on the further fact that in the letter accompanying its application North Shore offered to enter into a contract similar to those obtaining in the other zones, whereas the final contract was essentially different. The argument is answered by the provisions of the charter. Two distinct public hearings are required. The first is a hearing upon the petition for a con-

tract; the second is a hearing upon the form of the contract itself. Obviously the board is not confined to the precise form of contract mentioned by the applicant in his petition. If it were, the second hearing would serve no useful purpose. Conversely, the requirement for a second hearing shows clearly that the board is empowered to depart from the form of contract referred to in the petition. The petition, in fact, need not refer to the terms of the proposed contract at all. (*Tompkins Bus Corp.* v. *LaGuardia*, 156 Misc. 651; affd., 246 App. Div. 714.)

The next point relates to the board's inquiry into the money value of the contract and the adequacy of the compensation. We agree with the ruling of the trial court in excluding evidence designed to show that no such inquiry was in fact made. Subdivision a of section 64 of the charter requires the secretary of the board of estimate and apportionment to keep a journal of the meetings of the board, which shall be a public record. Entries in the journal recite the making of the inquiry. In awarding franchises the board acts in a legislative capacity. (*City of New York* v. *Fifth Avenue Coach Co.*, 237 App. Div. 383; affd., 262 N. Y. 481; *Brooklyn City Railroad Co.* v. *Whalen*, 191 App. Div. 737; affd., 229 N. Y. 570.) The action of a legislative body, as recorded in its journal, may not be attacked collaterally. (*People* v. *Devlin*, 33 N. Y. 269, 281; *Kittinger* v. *Buffalo Traction Co.*, 160 id. 377, 388; *Matter of Sloane* v. *Walsh*, 245 id. 208.) The rule is founded in the great confusion in the public business which would result if the official record of the acts of legislative bodies could be impeached.

The final contention is that the notices of hearings were not properly published. In our opinion the point is well taken and requires a reversal of the judgment. Section 368 of the present New York City Charter requires publication of the notices in " two newspapers published in the borough or boroughs affected." Under the former charter (§ 74) publication might be in any newspaper published " in the city." The change effected by the new charter is significant. The proper publicising of contracts of this character is of the highest importance. Quite evidently the Legislature decided that the public interests would be better served by publication in newspapers published in the borough or boroughs affected by the proposed contract than in newspapers published elsewhere within the city. The city may not ignore the legislative command, nor should the courts close their eyes to a violation of the mandate.

The question here is whether the *New York World-Telegram* is a newspaper published in the borough affected, *i. e.*, in the borough of Queens — within the meaning of the charter provision. Although ultimately circulated throughout the city, it is printed

and first given to the public in the borough of Manhattan. In these circumstances we regard the decision of the Court of Appeals in *Village of Tonawanda* v. *Price* (171 N. Y. 415) as decisive against the validity of the publication of the notices in that newspaper. There it was held that the " place of publication " is the place where the paper is first given to the public for circulation. To the same effect are the decisions in *Leroy* v. *Jamison* (3 Saw. 386 [9th Circuit]), in an opinion written by Mr. Justice FIELD of the United States Supreme Court, and of Mr. Justice HOLMES in *Rose* v. *Fall River Five Cents Savings Bank* (165 Mass. 273; 43 N. E. 93). In view of these authorities it must be held that the *World-Telegram* is not a newspaper published in the borough of Queens as intended by the New York City Charter. It follows that the notices of hearing upon this contract were not properly publicised, and that the contract is illegal.

The judgment should be reversed on the law, with costs, and judgment directed in favor of the plaintiff for the relief demanded in the complaint, with costs.

LAZANSKY, P. J., HAGARTY, CARSWELL and ADEL, JJ., concur.

Judgment reversed on the law, with costs, and judgment directed in favor of the plaintiff for the relief demanded in the complaint, with costs.