OPINION OF THE COURT
Bentley Kassal, J.
background
This is a taxpayer’s action, under section 51 of the General Municipal Law, to declare illegal, null and void a franchise issued by the City of New York to Knickerbocker Communications Corporation (Knickerbocker) to provide cable television service to the Borough of Queens and further, for an injunction to prevent any performance of the resulting contract. The taxpayer plaintiff is Orth-O-Vision, Inc. (Ortho), a company which currently provides limited closed circuit pay television service, through a master antenna system, to apartment houses in parts of Queens and which previously had made *990 application for a franchise similar to the one presently involved. The defendants are: (1) the City of New York, the Mayor and the other individual members of the Board of Estimate (collectively City), which approved the franchise and contract; and (2) Knickerbocker, the successful applicant for the franchise.
By way of interim relief, Ortho has moved for a preliminary injunction, enjoining and restraining the defendants from proceeding to implement the contract entered into in pursuance of the franchise, and the defendants have cross-moved to dismiss the complaint for failure to state a cause of action.
plaintiff’s position
Ortho asserts several bases upon which it is claimed that the implementation of the franchise which is sought to be enjoined is defective and illegal, which are, principally these, inter alia:
A. the notice of the public hearing on the proposed contract was not properly published in the appropriate local newspapers, as required by section 371 of the New York City Charter (City Charter);
B. the present proposed contract is so fundamentally different in nature and scope from the franchise originally proposed at the commencement of the proceedings by the initial petition that, as a result of such invalid notice, it cannot be maintained that a proper hearing was held on the petition for the franchise being granted, as contemplated and required by sections 366-a and 368 of the City Charter;
C. the petition for the franchise was not properly forwarded to the local community planning boards for review as required, pursuant to the City’s Uniform Land Use Review Procedure (ULURP; City Charter, §§ 366-a, 197-c).
defendants’ position
In opposition, the defendants deny Ortho’s claims of any procedural infirmities and contend that if any deviations from proper procedure occurred, they were merely inconsequential technicalities, not rendering the contract illegal. They further allege that (1) Ortho’s complaint fails to state a cause of action, (2) Ortho lacks standing to maintain the action as a taxpayer’s action and (3) the action is barred by laches.
*991 DISCUSSION
Since the latter two objections raise threshold issues as to the validity of the underlying action, they must be considered first, and, if necessary, the remaining issues, which go to the merits of the motion for a preliminary injunction, will be considered thereafter.
1. TAXPAYER’S ACTION — STANDING
Section 51 of the General Municipal Law provides that taxpayers "whose assessments shall amount to one thousand dollars” may maintain an action against a municipal corporation and persons acting on its behalf "to prevent any illegal official act on the part of [such persons], or to prevent waste or injury to * * * any property, funds or estate of such * * * municipal corporation”. It is undisputed that Ortho meets the assessment test for this taxpayer statute, and, thus, need not show any direct injury to itself. However, it must demonstrate a public injury. (Bloom v Mayor of City of N. Y., 35 AD2d 92, 95, affd 28 NY2d 952.) Therefore, I am concluding that Ortho is a taxpayer, as contemplated by section 51 of the General Municipal Law, and the fact that it is described by Knickerbocker as "a disgruntled and unsuccessful franchise applicant” probably is true but it is nevertheless irrelevant to the determination of the validity of this proceeding.
Finally, in this regard, a taxpayer’s action may only be maintained to prevent waste or to prevent an illegal act. (Bush v Coler, 60 App Div 56, 60, affd 170 NY 587; Campbell v City of New York, 244 NY 317.) Where, as here, the acts are claimed to be illegal, the plaintiff must establish that the illegality tends to "the detriment of the city either by the dissipation of its funds or by the threat of other injury so imminent and substantial as to make it proper ■ that the taxpayers be protected by injunction” (Campbell v City of New York, supra, p 330). The franchise and contract here, if illegal, would permit the opening and use of city streets without proper authority, and, as such, would constitute a trespass to city property and a public nuisance which may be prevented by a taxpayer’s action. (Blanshard v City of New York, 262 NY 5, 10-11).
Accordingly, for the purposes of this phase of this motion, I find that the complaint sufficiently alleges the elements of a taxpayer’s action, under section 51 of the General Municipal Law and Ortho has standing to maintain it.
*992 2. LACHES
Knickerbocker also alleges that Ortho is barred by laches from seeking the relief requested, since it failed to timely challenge, by a CPLR article 78 proceeding, the rejection of its own franchise application. Although an interesting approach, it is nevertheless clear that the availability of similar relief in an article 78 proceeding is no bar to this action. (Bloom v Mayor of City of N. Y., supra, p 97.) Thus the fact that Ortho now proceeds as a taxpayer to challenge the contract awarded to Knickerbocker, rather than the denial of its own earlier application for a franchise, does not make Ortho guilty of laches.
3. ILLEGALITY OF CITY’S ACTS
Several points are raised in this regard and they should be individually addressed:
A. IMPROPER NOTICE
Section 368 of the City Charter requires that publication of a petition for a contract and notice of a public hearing thereon be made in two daily newspapers. If daily newspapers are published in the borough affected, they must be employed for this purpose. If only one daily newspaper is published in thé borough, the Mayor may designate a daily newspaper published in the city and circulated in the borough as the second, if none is published in the borough, the Mayor may designate two city-wide dailies. Ortho does not challenge the fact that the original publication of the notices herein in the Long Island Press and the New York Law Journal did comply with this requirement up until that point.
However, Ortho contends that section 371 of the City Charter requires that the notice of the hearing on the proposed contract be published in the same two newspapers as the petition and notice of public hearing. In this case, in the interim between the dates of publication of these two required notices, the Long Island Press ceased publication and, accordingly, the Mayor designated the Wall Street Journal as its substitute newspaper for the second publication. It is the validity of this publication which Ortho challenges based upon the undisputed fact that the Wall Street Journal is neither the same newspaper as the Long Island Press nor is it published in Queens.
Ortho’s argument as to the failure to publish the second notice in the same newspaper as the first is unpersuasive *993 since it would be clearly illogical and unreasonable for this court to interpret section 371 of the City Charter as requiring the nullification of extensive governmental proceedings simply because a newspaper ceased publication.
The argument that the Wall Street Journal is not published in Queens is more compelling, since section 371 is clearly intended to fortify the requirement of section 368 of the City Charter that such notices be published in a newspaper in the borough affected and failure to comply with that requirement has been found to be grounds for invalidating a contract. (Loos v City of New York, 257 App Div 219.)
But, this is not an absolute requirement. Section 368 of the City Charter provides that, when no daily newspaper is published in the borough affected, other newspapers, circulated in the borough, may be substituted. In this regard, Ortho has wholly failed in its burden to demonstrate that another daily newspaper is published in Queens, and accordingly, it has failed to demonstrate the illegality of the City’s action by the Mayor’s designation of the Wall Street Journal as a substitute newspaper.
B. MATERIAL DIFFERENCE BETWEEN FRANCHISE AND CONTRACT
The illegality alleged here involves the complex procedure, statutorily required, for the award of a franchise by the City. The essential elements of that procedure were clearly summarized by the Court of Appeals in Blanshard v City of New York (262 NY 5, 11-12, supra) as follows (although the City Charter has undergone some modification, the summary remains accurate):
"(1) A public hearing shall be held upon the petition therefor. [City Charter, § 368 (a).]
"(2) The Board of Estimate * * * shall make inquiry as to the money value of the franchise. [City Charter, § 369.]
"(3) The Board shall make inquiry as to the adequacy of the compensation proposed to be paid therefor. [City Charter, § 369.]
"(4) The Board shall embody the result of such inquiry in a form of contract. [City Charter, § 369.]
"(5) The Board shall hold a public hearing on the proposed contract after public notice. [City Charter, § 371.]”
The essence of Ortho’s position on this point is that the proposed contract varies so materially and substantially from *994 the franchise proposed that it cannot be said that the original public hearing was held "upon the petition therefor.”
Ortho does concede that the Board of Estimate, in preparing the final contract is free, to a limited extent, to modify certain terms or changes in the contract in nonessential ways, but argues that the variance here is so critical that it greatly exceeds such bounds. In this regard, there is apparently only one decision in this State which discussed this issue. In Loos v City of New York (supra, pp 222-223) the court stated: "Two distinct public hearings are required. The first is a hearing upon the petition for a contract; the second is a hearing upon the form of the contract itself. Obviously the board is not confined to the precise form of contract mentioned by the applicant in his petition. If it were, the second hearing would serve no useful purpose. Conversely, the requirement for a second hearing shows clearly that the board is empowered to depart from the form of contract referred to in the petition. The petition, in fact, need not refer to the terms of the proposed contract at all. (Tompkins Bus Corp. v. LaGuardia, 156 Misc. 651; affd., 246 App. Div. 714.)”
The court in Loos v City of New York (supra) found that there was no improper variance between the contract and the petition involved in that case. Ortho has not cited a case where an improper variance has been found nor has this court been able to find any precedent in this area. Ortho relies heavily on the case of Margulis v Lindsay (31 NY2d 167), but that case is inapplicable since, as highlighted by Chief Judge Breitel (supra, p 174) it dealt with the statutory construction of a specific section of the Public Housing Law, which is not involved herein.
In view of this legal background, the factual situation in the instant case must be carefully examined to determine whether, at trial, Ortho will have a clear likelihood of success in meeting this heavy burden of proof.
FACTS RELATING TO ORIGINAL PETITION, HEARING AND CONTRACT
The original petition by Knickerbocker sought "authorization to operate a closed circuit communications system in the Borough of Queens, City and State of New York” (emphasis added). On October 7, 1976, the Board of Estimate held a public hearing as required by section 368 of the City Charter. *995 That hearing began with the following comments by the assistant to the Deputy Mayor and the director of franchises:
"The Assistant to the Deputy Mayor: Mr. Tarshis, can you enlighten us as to what we have before us at this time?
"Mr. Morris Tarshis, Director of Franchises: Mr. Mayor, what’s before us today is a hearing on a petition for a closed circuit T. V. system * * *
"The sole purpose of this hearing today is to hear from the various segments of the community, from the applicant and from others who have an interest, expressing their views as to whether they believe the concept of closed circuit is in the best interests of the city and the people in Queens or whether it is not” (emphasis added).
The reason stated for limiting the proposal to a closed circuit system was that such a system would be free from regulation from the Federal Communications Commission, which regulation the City sought to avoid.
At the October 7, 1976 hearing, numerous witnesses testified in opposition to the petition on the grounds that it would not provide a "full service system” or even those services which were provided by the existing cable television franchises in Manhattan. The hearing was thereafter closed and the matter laid over without date, awaiting preparation of a contract embodying the terms of the franchise to be awarded.
For the next two years, investigation and negotiations proceeded to develop a proposed franchise contract. Finally, on September 14, 1978, the Board of Estimate held a public hearing on the proposed contract. The contract presented at that hearing did not call for a closed circuit communications system, as originally petitioned. Rather, it permitted a full service broadband communications system, consisting of a community antenna television system and various specialized services. In fact, the contract, as proposed at this September 14, 1978 hearing, even bore an addendum, dated but one day before, providing for services not listed in the original printed contract, nor included in the published notice of such September, 1978 contract.
It is critical to this decision that a careful evaluation be made as to what the essential features are in a closed circuit television system (closed circuit) as compared with the scope of a full service cable television system (full service). In this *996 regard, it would be helpful to examine the very descriptions by the parties themselves.
The major distinction between the system proposed by the petition and the one now presented in the franchise contract is explained by Knickerbocker’s expert witness as follows:
"A 'closed circuit TV system’ is simply a TV distribution network carried by wire. It originates its programming and carries its signals to various points in a system and over-the-air broadcast transmissions are not available at its terminals.
"A 'full service cable TV system’ is one that originates its own programming and receives over-the-air broadcast signals that are retransmitted via cable.”
Although, in fact, there are other differences between systems described in the petition and that provided in the proposed contract, it is this distinction that is crucial. It may appear to be simply a technical difference, but, in actuality, its impact is clear in terms a layman may appreciate. Basically, a full service system would include all of the services and facilities of a closed circuit system (origination and transmission of its own programs), which is the full extent of the system originally petitioned and noticed for hearing in 1976, plus the following:
(1) All of the VHF television stations available in the New York City area (Channels 2, 4, 5, 7, 9, 11 and 13);
(2) the UHF stations available here (now totaling eight stations);
(3) numerous additional VHF and UHF stations from other cities in the United States and, potentially, throughout the world.
The system, described in the original petition for hearing in 1976, would only provide the closed circuit system, not the several other features outlined. This is a significant difference for two critical reasons. First, as evidenced by the hearing transcripts, annexed as exhibits, the testimony at these hearings disclosed that a great many Queens residents have poor over-the-air television reception and eagerly sought any facilities for improvement. Second, the initiation of such additional and expanded services would result in a great increase in the number of subscribers for the service, thereby greatly influencing its economic viability and value.
Accordingly, I find that Ortho has demonstrated a clear likelihood that it will succeed upon trial in establishing that *997 the variance between the contract now proposed and the original petition is so material and substantial that the procedure required by sections 366-a and 368 of the City Charter has not been followed thereby rendering the contract illegal.
C. UNIFORM LAND USE REVIEW PROCEDURE
The last basis, upon which Ortho challenges the legality of the franchise contract awarded, is that the petition was not properly referred to the local community boards for review prior to the hearing, as required by law. The defendants concede that the community board notice requirements of the present City Charter were not complied with, but they claim that such provisions are not applicable to this franchise application since the original petition itself predated the effective date of the new charter requirements. They thereby claim that this obviates such submission. They also claim that various other types of notice were given to the local community boards and, thus, there was adequate participation by them in the awarding of the franchise.
Again, in order to properly understand this issue it is imperative to examine the history of the present Uniform Land Use Review Procedure (ULURP) of the City Charter.
In 1972, pursuant to chapter 634 of the Laws of 1972 (later revised and extended by chapters 63 and 385 of the Laws of 1973 and chapter 50 of the Laws of 1976), the Charter Review Commission for New York City was created. The express reason for its creation, as appears in the legislative findings of the enabling legislation, was stated as follows:
"The legislature finds that:
"a. structural reform of city government is necessary and desirable to (i) encourage genuine citizen participation in local city government, (ii) ensure that local city government is responsive to the needs of its citizens, (iii) achieve for cities effective local self-government” (L 1972, ch 634, § 1).
The resulting amendments to the City Charter were presented to the voters and approved in the general election held November 4, 1975. Among those amendments approved were the following additions to sections 366-a and 368 of the City Charter (additions italicized):
"§ 366-a. Review of proposals. — a. A petition for a franchise or revocable consent shall be filed with the board of estimate, department of city planning and the bureau of franchises.
"b. Review by a community board or borough board of such *998 petition shall be in the manner speciñed pursuant to section one hundred ninety-seven-c. [ULURP]”
"§ 368. Public hearing on the petition. — a. Before any such contract shall be made, a public hearing shall be held by the board of estimate upon the petition therefor at which citizens, including representatives of community or borough boards, shall be entitled to appear and be heard. * * *
"b. Copies of such notice, together with the petition in full, shall be forwarded to the community board or boards in the community district or districts affected, and to the borough board or boards for review pursuant to section one hundred ninety-seven-c. [ULURP]”
Section 197-c (subd a, par [6], subds b-i) provides for a specific review procedure by the local community boards upon receipt of notice of a petition for a franchise.
The effective date of these amendments is provided by section 1152 of the City Charter:
"The amendments to the charter * * * shall take effect on January first, nineteen hundred seventy-seven * * * except: * * *
"(2) that powers and duties of community boards and borough boards pursuant to chapters * * * fourteen [which includes §§ 366-a and 368] shall be assumed by the existing community boards and borough boards on July first, nineteen hundred seventy-six”.
Thus, it is clear that the effective date of the provision requiring notice to the local community boards of petitions for franchises is July 1, 1976. Here the petition was filed on April 20, 1976, but notice of the hearing was not published until August, 1976, when the City failed to comply with the ULURP by not submitting this proposal to the local community boards in accordance with the amendments then in effect.
I am holding that the mere fact that the original notice of petition did precede the effective date of these sections by about two months does not automatically mean that the more important steps to be taken thereafter, such as the mandated public hearing, can proceed without the direct legal participation in this process by the local community boards. Possibly that might be the case if virtually all, or almost all, the steps had preceded July 1, 1976, the effective date for the active role by local community boards in such decisions. However, that was not the case. It is a question of weighing how many of the *999 essential franchise steps had been fully completed when the legislation involving the local community boards took effect. In my opinion, the then completed steps were, at best, like the tip of the iceberg — less than a small fraction.
But, there is a more critical and persuasive factor in this decision, namely, the final product which did result from this process — the proposed contract — varies enormously in substance, from the original proposal. Therefore, in the effectuation of the spirit and purpose of the law as set forth in the legislative findings and in light of the background as to the desired role for the local community boards, it would be an effective end run around these salutory safeguards mandating community participation if the present contract were permitted to be implemented without employing the procedure embodied in these charter amendments for community involvement.
CONCLUSION
Ortho has demonstrated on this motion a clear likelihood that it will establish upon trial that the City failed to comply with the specific requirements of the City Charter providing for notice to local community boards and that this is a substantial deviation, as stated above. Such failure, if established, would render the contract void and illegal. (Blanshard v City of New York, 262 NY 5, 12, supra; Loos v City of New York, 257 App Div 219, 224, supra.) Moreover, in the context of the services to be presented, the differences found between the original petition for the franchise and the proposed contract render the failure to properly notify the local community boards, and to receive their input, even more significant.
In view of the last two findings above, it is unnecessary to consider the other procedural infirmities alleged. Although the relief requested is drastic, Ortho has established that it is warranted in this proceeding to prevent public injury from illegal acts described.
I am very much aware of the fact that the residents of the Borough of Queens have been long suffering and are eagerly awaiting the installation of facilities for improved television reception. All lawful attempts to expedite the desirable advent of these services should be encouraged. I am not pleased that my conclusions at this juncture are that the original proposed service, as published, is so substantially different from the final contract and, equally important, that the local commu *1000 nity boards have not been enabled to have proper input in this procedure, as mandated by the new City Charter amendments, but I have no alternative.
Although the timetable of this series of events shows that the original petition was filed in April, 1976 with the proposed contract being submitted in September, 1978, there appears to be no reason why proper and diligent processing of this franchise, through the mandated route of the local community boards, could not be pursued again and completed within a relatively short period of time.
DECISION
Accordingly, the motion for a preliminary injunction is granted and the cross motions to dismiss are denied. Ortho’s application for summary judgment is denied as premature.
(On reargument July 24, 1979)
The defendants, Knickerbocker Communications Corp. (Knickerbocker) and the City of New York (City), move for reargument and renewal of the prior motion of the plaintiff, Orth-O-Vision, Inc. (Ortho), for a preliminary injunction enjoining and restraining the defendants from implementing their contract authorizing Knickerbocker to establish a cable television (cable TV) system in the Borough of Queens.
The grounds offered for both branches of the motion are minimal, at most. In essence, Knickerbocker asserts that it was not fully prepared at the time of the original motion, it did not properly present certain matters to the court and it failed to offer other evidence which was then available. These grounds are insufficient, by themselves, to justify renewal and the failure to demonstrate that this court overlooked a controlling principle in rendering the prior memorandum decision would justify denial of the motion to reargue, as well. (See, generally, American Trading Co. v Fish, 87 Misc 2d 193.)
However, since this matter is before the court as a taxpayer’s suit, the public interest dictates that it be resolved on a clear and complete record. Accordingly, the voluminous papers submitted on this motion have been reviewed, as well as those previously submitted, and the prior determination has been reconsidered.
The defendants argue that the prior decision was incorrect for the following specific reasons:
*1001 1. The Uniform Land Use Review Procedure (ULURP), mandated by section 197-c of the New York City Charter, was not intended to apply to cable TV franchises, because they involve no significant land use and the land use impact would be minimal;
2. ULURP was not in effect at the time this matter was initiated;
3. There was adequate, albeit informal, review by the community board which, in any event, should be deemed a proper substitute for ULURP and a cure of any technical defect;
4. The franchise procedure, mandated by chapter 14 of the New York City Charter, presumes there will be important modifications between the original petition and the final approved contract and a new petition is not required when such changes are made;
5. There was no significant difference between the cable system described in the original petition and in the final contract;
6. There is no public injury sufficient to warrant a taxpayer’s action under section 51 of the General Municipal Law.
These will be addressed in order.
ISSUE I — DOES ULURP APPLY TO CABLE TV FRANCHISES?
A. GENERAL APPLICABILITY TO CABLE TV FRANCHISES
 Today, and in the past, the position of the City and its various officials and agencies, with respect to the applicability of ULURP to cable TV franchises, has been far from uniform.
As noted in this court’s memorandum decision, dated March 19, 1979 (memorandum decision), ULURP was adopted by a series of amendments to the New York City Charter, approved at the general election held November 4, 1975. Section 366-a of the New York City Charter, as then enacted, provides:
"Review of proposals. — a. A petition for a franchise or revocable consent shall be filed with the board of estimate * * *
"b. Review by a community board or borough board of such petition shall be in the manner speciñed pursuant to section one hundred ninety-seven-c” (emphasis added).
Section 197-c (subd a, par [6] [prior to amendment in 1977]), which provides the ULURP rules, states:
"Such procedure shall apply to changes, approvals, contracts, consents, permits, and authorizations respecting: * * *
*1002 "(6) Franchises and revocable consents involving residential, industrial, commercial or community facility projects”.
Knickerbocker and the City both contend that this language was not intended to apply for all franchises, but only those with a significant land use impact, arguing that cable TV franchises are not covered since they have relatively little land use impact. In support of their position, they cite the Preliminary Recommendations of the State Charter Revision Commission for New York City (1975) (Preliminary Recommendations), which, at page 118, discusses certain exceptions to the normal ULURP procedure for "[franchises and revocable consents of a highly technical nature (e.g., vaults, conduits, and pipes below ground) which have little impact on overall land use policy”. Reading that section in context, however, makes it clear that the areas discussed are not exempted from community board review but only from City Planning Department review. That section of the Preliminary Recommendations begins with the statement (p 118): "There are necessary exceptions to a complete uniform process which relate to the intermediate level of professional review [Department of City Planning] * * * the process is uniform at the point of first action — local Community Board — and at the point of final review — the Board of Estimate.” (Emphasis added.)
The defendants also cite Opinion No. 108,445, issued by the Corporation Counsel to the Chairman of the City Planning Commission, dated August 5, 1977. While the Corporation Counsel’s interpretation of the intent of the charter amendments, issued almost two years after the enactment of ULURP and more than a year after Knickerbocker’s petition, is clearly not controlling, it is interesting that the defendants have again offered a single out-of-context statement rather than the main thrust of the opinion, which contracts their position.
The defendants quote a portion of the Corporation Counsel’s opinion which states: "It is my understanding that the granting of cable TV franchises would involve the installation of cable either below ground or on already existing utility poles above ground. The actual land use impact of such cable installation would be minimal.”
However, continuing, the unquoted sections of the same document also add:
"Section 366-a requires that all petitions for franchises or *1003 revocable consents be * * * reviewed by community boards and borough boards. * * *
"Accordingly, it is my opinion that petitions for cabe TV franchises need not be reviewed by the City Planning Commission — [the intermediate professional review discussed in the Preliminary Recommendation, above] * * * Community boards and borough boards must, however, be given the opportunity to review such petitions in accordance with Charter, §§366-a and 197-c.” (Emphasis added.)
Similarly, an opinion letter issued by the counsel to the State Charter Review Commission to the City Planning Commission, dated August 27, 1976, states: "the discussions held by the Charter Commission involving franchises and revocable consents fully intended that cable T. V. be included as an element to fall within whatever Land Use Review Procedure was eventually evolved for Community Planning Boards and City Planning Commission.” (Emphasis added.)
Finally, it is ironic and interesting that the City is presently defending another suit by an independent pay television operator. The claim there is that the City improperly applied the ULURP procedure to his franchise application only a few months after Knickerbocker’s application. (Miller v New York State Comm. on Cable Tel, 77 Civ 5361, US Dist Ct, SONY.) In that action, the City admitted that they had originally applied ULURP to cable TV franchises but discontinued such ULURP review of cable TV franchise applications after the Corporation Counsel rendered Opinion No. 108,445, discussed above.
Thus, there appears to be no basis for the claim that cable TV franchises are excluded from ULURP.
B. Applicability to Knickerbocker’s Proposed Franchise
The defendants argue that ULURP should not apply to this specific cable TV franchise because the land use impact would be minimal, stating that the cable would run almost exclusively via existing utility poles or existing underground pipes, conduits or vaults owned by private corporations. (While these are private utility facilities, the City grants Knickerbocker the right to use them in paragraph 3[i] of the proposed contract.) However, even if only 5% of Knickerbocker’s multimillion dollar county-wide project required new construction, its impact could be significant. In fact, analyzing the proposed contract, the only consideration offered by the City in return for its franchise fee and other considerations to it is the award *1004 of "a franchise for the occupation or use of the street within the Borough for the construction operation and maintenance of a System [of cable TV].” Presumably, if there were no significant land use impact to City property there would be no need for this franchise.
The land use impact of this franchise is further evidenced by the construction schedule, which was modified during the drafting of the contract, and which expressly spells out the order of construction of the system by reference to a schedule of completion for the facilities in each community planning board district.
Nor should the application of ULURP depend on the particular cable TV franchise proposal since it would be inequitable to apply ULURP to a petition for a franchise where existing utility routes do not exist and exempting from such review areas of the City where they do. In that event, the controlling aspect would be whether or not there are some present usable facilities, which is not the intent of the ULURP procedures.
More importantly, the proposed franchise contract involves more than the mere stringing of wires. Section 4, paragraph g, for example, requires the Knickerbocker to provide, free of charge, installation and service to one outlet on each floor in every prison, reformatory, detention center, hospital, police and fire station, city university, public library, senior citizen center and daycare center in Queens. Also, section 4, paragraph d, requires Knickerbocker to supply, without charge, a minimum of one channel for use by the City of New York and two channels for use by the public. Finally, the addendum to the contract, discussed in the memorandum decision, indicates that the system will have a two-way capability.
The indirect, but important, potential land use impact of these provisions is discussed in a June 24, 1976 memorandum from the Queens Office of the City Planning Commission, and includes, inter alia, the following examples:
The hospital hookup could provide special health care consultation to neighborhood facilities without the need for new construction there.
The city university hookups would obviate the need for new classroom facilities or commuting between campuses by providing televised classes originating at one campus to others.
The community planning boards, themselves, could be linked with each other and various city agencies for purposes *1005 of joint public hearing without the need for long distance transportation or new public facilities. Such examples of indirect land use impact of this system or possible alternative systems were testified to at the September 14, 1978 Board of Estimate meeting.
The very purpose of ULURP is to measure the land use impact of a particular proposal and to weigh it against other possible alternatives which may have lesser or greater land use impact. Since the subject matter of the proposal is within the scope defined by ULURP, the degree of land use impact, per se, is not dispositive of whether a proposal must be reviewed under ULURP.
Certainly the over-all land use impact of this franchise is far more substantial than that resulting from a single "sidewalk cafe”, which all parties agree must be reviewed under ULURP. Thus, there appears to be no basis for exempting this particular cable TV franchise from ULURP.
ISSUE II — WAS ULURP IN EFFECT AT THE TIME THIS PETITION FOR A FRANCHISE WAS CONSIDERED?
 In the memorandum decision, this court determined that the community boards had assumed some of their ULURP processing powers on July 1, 1976, before the crucial date of August, 1976, when a notice of the Board Estimate hearing herein was published. The only new argument now presented on this issue is that the Department of City Planning had not assumed its ULURP processing powers until January 1, 1977 — after the Board of Estimate hearing.
An analysis of the ULURP functions of the Department of City Planning reveals that this factor is far from controlling. As discussed previously, unlike the community boards and the Board of Estimate, the function of the Department of City Planning, in reviewing franchise applications, is minimal and discretionary. In fact, the only role of the Department of City Planning, before the community board review, is to accept the filing of the petition for the franchise and to refer it to the community boards. (New York City Charter, § 197-c, subd b.)
Thus, there is no basis for disturbing the prior determination that the community boards had assumed their ULURP processing powers at the time this petition was considered and should have received notice to review the proposed franchise.
ISSUE III — DID THE INFORMAL REVIEW IN FACT PROVIDE AN *1006 ADEQUATE SUBSTITUTE, THEREBY CURING ANY DEFECT RESULTING FROM THE FAILURE TO APPLY ULURP?
Although some of the community boards actively participated in an informal review of the franchise application, others had no input because they were never given formal notice under ULURP. In support of their argument that there was sufficient informal community board review, the defendants rely heavily on a 16-page affidavit by Sylvia S. Hack, the chairperson of both the Cable TV Committee of Queens Community Board 9 and the Joint Cable TV Committee for Queens Community Boards 9, 10 and 11. Although her April 17, 1979 affidavit now claims that the community boards "had an early, direct, continuing and influential participation” in the review of the franchise, as late as June 15, 1978, she was of a different mind when she wrote to Mayor Koch, stating:
"Since June 1977 the Bureau of Franchises had been engaged in formal negotiations with ATC * * * In all this time, the Director of Franchises, Morris Tarshis, has refused to share any of the draft contracts with the Cable Committee of Queens Community Boards * * *
"[Wjhat we have seen for nearly two years is a series of closed door decisions * * * The Board of Estimate’s own committee has shown a remarkable lack of interest in the community. Operating in closed sessions, barely acknowledging the existence of the Community Boards, that committee has cooperated with the Bureau to deny public access and input into the process * * *
"And now, even when negotiations are supposedly complete, the Bureau has not only failed to disclose the contract provisions to the Community Boards, but has proceeded to raise new obstacles. * * *
"The Bureau of Franchises has operated and continues to operate behind closed doors. Its Director has ignored all requests for contract draft and for an open meeting with all the parties concerned.”
It is clear from the voluminous papers submitted, including several statements of community board representatives, that full participation of the community boards, as now required, was not afforded and proper notice was not given. In fact, as recited in the memorandum decision, one day before the Board of Estimate hearing on the proposed contract, on September 14, 1978, an addendum was added, without any notice, *1007 which changed the services to be provided under the franchise.
The findings recited in support of ULURP in the Preliminary Recommendations of the State Charter Revision Commission state (p 113):
"Communities are often not informed of pending land use plans and public improvements until after applications have been filed and reviewed by central City agencies. * * *
"The planning process should reflect the interest of local communities on more than an ad hoc basis. A decentralized hearing procedure is needed through which communities and their representatives can participate in planning decisions. The inadequacy of the current informal mechanisms for community involvement was acknowledged by John E. Zuccotti, Chairman of the City Planning Commission, in testimony before the Charter Commission in March 1973: * * *
" 'We have moved in this direction in recent years, but on an ad hoc, informal basis. Communities have participated— but sometimes too little or too late to have any impact or to avoid conflict.
" 'The problem is the lack of a neighborhood tribunal where concerned residents can influence and shape decisions affecting their future. Such a local forum should be provided as a formal part of the planning process. And the community boards should be the vehicle for enriched community participation’ ”.
The same Preliminary Recommendation describes the changed role of the community boards under ULURP as follows (p 118):
"Initial Review by Community Boards: Community-level review of land use issues varies with respect to timing — which is the critical factor. Community Boards are not usually involved until after extensive review of applications and negotiations with developers by the City Planning Department and other agencies. This often means that community involvement is limited to pro forma review of decisions already made.
"The essence of the Charter Commission’s proposals for the increased participation of local communities in the planning process is that review of land use applications shall take place at the community level before other governmental entities act on them.” (Emphasis in original.)
ULURP was intended to provide the community boards *1008 with a formal role, involving early and significant input into decisions relating to franchises. Since it is not a mere pro forma review, this court cannot presume to determine what a proper ULURP review would have revealed or what modifications in the franchise would have been forthcoming. What is clear is that the incomplete substitute informal review described by the defendants satisfied neither the letter nor the spirit of ULURP.
ISSUE IV — IS A NEW PETITION UNNECESSARY BECAUSE THE FRANCHISE PROCEDURE MANDATED BY THE ClTY CHARTER PRESUMES IMPORTANT MODIFICATIONS BETWEEN THE ORIGINAL PETITION AND THE CONTRACT?
As discussed in the memorandum decision, the franchise procedure permits changes in the franchise fee and some modification of nonessential terms between the original petition and the final contract. However, the steps between the original petition and the final contract are principally concerned with an investigation of the value of the franchise and the adequacy of the compensation, and the embodiment of the agreement in formal terms. (Blanshard v City of New York, 262 NY 5, 11-12.) Thus, while the franchise fee and other compensation may change after the investigation, the memorandum decision concluded that the formal contract must not be materially different from the petition. Any other determination would make meaningless the notice of the original petition, which is a crucial step in the process. (Loos v City of New York, 257 App Div 219.)
The City contends that such an interpretation of the procedural requirements is unworkable, as illustrated by the affidavit of Morris Tarshis, the Director of Franchises, dated April 17, 1979, which states: "For example, if a bus company petitions the Board for a bus route, the Board may substantially alter that bus route in response to points raised at a public hearing on the petition. Or, if a restaurant petitions for a closed sidewalk cafe, the Board may grant an open one. In the past, there has never been any doubt that the Board of Estimate had this authority without rescheduling a new hearing on a new petition; the hearing on the proposed contract ensures public input. The Court’s decision in the case at bar will significantly slow the franchise process down if each time substantial changes are made, the Board must schedule a new hearing on the petition. This is particularly true now that the Uniform Land Review Procedure exists, for a second round of *1009 ULURP hearings will be mandated since the new petition will trigger ULURP anew. I envision endless rounds of hearings on controversial items. Such a procedure was never contemplated by the drafters of the Charter.”
Admittedly, ULURP has imposed additional notice and review steps and greater public exposure in the process of granting franchises. This was anticipated, and in fact, appears to be the principal goal of the drafters of the charter amendments. However, it is significant that the major steps in community board review under ULURP occur before the first Board of Estimate hearing (New York City Charter, § 197-c, subd b) so there should be ample opportunity to make necessary changes before that hearing without the prolonged delays posited by the City.
Nor do the examples offered by the Tarshis affidavit add weight to the City’s argument. The same buses used on an extensive local bus transportation system within Queens could also be employed for a limited express bus service from the eastern end of Queens to Manhattan. It is difficult to imagine that anyone could argue that a petition for the former should in normal ULURP course be a basis for a contract for the latter. Similarly, the example of the sidewalk cafe may be reversed with a contract for a large enclosed sidewalk cafe (which seem to become permanent additions to many buildings) based upon a petition for a few tables in the open air on the sidewalk, like those in European cafes. Would any community board not find that there is a signficantly different land use impact between the two, warranting notice of the franchisee’s true or changed intent?
Accordingly, the public policy expressed in the charter amendments makes it even more imperative that any important variations between the contract and the original franchise petition be directly exposed to community boards.
ISSUE V — WAS THERE A MATERIAL DIFFERENCE BETWEEN THE ORIGINAL PETITION AND THE FINAL CONTRACT?
In the memorandum decision I determined that a material difference exists between the closed circuit system, originally presented in the petition, and the full service system, in the final contract, and I see no basis for changing that decision.
Two arguments are now offered. First, Knickerbocker states, in essence, that since the same basic hardware is used for both *1010 a closed circuit system and the full service system, there is no material difference. That same reasoning would apply to the example of the bus franchise discussed above, where the equipment may be the same but the services and land use impact would differ greatly. Similarly, the value of the franchise, and the appropriate compensation therefor differ greatly, depending on the ultimate services to the purchasing public.
The second argument, offered by the City through the affidavits of Morris Tarshis and others, is even more interesting. On the original motion it was claimed that the proposal for a closed circuit system was changed to a full service system as a result of substantial public opposition to the original proposal. Now, however, Morris Tarshis claims that there is no material difference because it was always contemplated that this system would be a full service system:
"Knickerbocker * * * submitted a petition for a 'closed circuit communications system,’ rather than full service, at my suggestion. This suggestion was made because the Federal Communications Commission was at that time — and still is— limiting the amount of compensation the City could receive from such a franchise to a maximum of 3% to 5% of the gross residential subscriber revenues. * * *
"[T]he designation of 'closed circuit communications system’ was merely an attempt to avoid the federal regulations of CATV which I believe are not in the best interests of the City.
"The initial contemplation of both Knickerbocker and the Bureau of Franchises was that the Knickerbocker system would have the capacity to carry 30 channels, 17 of which would be reserved for eventually carrying the 17 VHF and UHF channels operating in the metropolitan area.” (Emphasis added.)
Irrespective of whether Knickerbocker, the director of franchises, and even various community members initially intended the franchise to be for a full service cable TV system, the petition was expressly limited to and publicly labeled "authorization to operate a closed circuit communications system.” This was the petition published pursuant to section 368 of the New York City Charter and which appeared on the calendar of the Board of Estimate. As a matter of public policy, it may not now be attacked collaterally to demonstrate that it was merely a subterfuge to avoid unfavorable Federal *1011 regulations. (Loos v City of New York, 257 App Div 219, 223 and the cases cited thereat, supra.)
By similar reasoning, our City government could have described the proposed massive Westway project as a simple repair of the existing highway to avoid Federal environmental impact review.
The very fact that the director of franchises claims that the franchise was described as a closed circuit system rather than a full service cable system to avoid Federal regulations, which apply only to the latter, in itself, indicates that there is a material difference between the two systems.
Thus, no basis has been presented to modify the prior determination on this issue.
ISSUE VI — HAS THE PROSPECT OF SUFFICIENT PUBLIC INJURY BEEN ESTABLISHED WARRANTING A TAXPAYER’S ACTION UNDER SECTION 51 of the General Municipal Law?
The memorandum decision concluded that the franchise, if illegal, "would constitute a trespass to city property and a public nuisance which may be prevented by a taxpayer’s action.” (Orth-O-Vision v City of New York; Blanshard v City of New York, 262 NY 5, 10-11, supra.) Knickerbocker now asserts that there can be no waste of the City’s funds or property — even if the contract is illegal and there is a technical trespass — since the franchise fee is the highest permitted under the Federal regulations.
The proposed contract recites other considerations for the franchise, in addition to the franchise fee, in terms of services to be rendered to the City, without charge. These include the services previously discussed in terms of the substantial indirect land use impact to Queens. (See Issue I B, supra.) From the exhibits submitted, it is clear that many of the objections presented at the public hearings were that such services were insufficient. While at this time, plaintiff may not be in a position, prior to disclosure, to measure and spell out the full dollar value of such potential "waste”, that, in itself, should not preclude injunctive relief to prevent the illegal act. (Brill v Miller, 140 App Div 602.) Thus, there appears to be no basis. for disturbing the prior determination on this issue.
SUMMARY JUDGMENT
Ortho’s original motion was limited to an application for a preliminary injunction. In response to the defendants’ cross *1012 motions to dismiss the complaint, Ortho’s attorney, in a reply affirmation, informally requested summary judgment as to those grounds upon which relief was requested where no triable issue of fact existed and an immediate trial as to all other issues. This request was denied as premature in the original memorandum decision.
At the oral reargument, Knickerbocker’s attorney requested that the motion now be treated as one for summary judgment, which request is opposed by Ortho, on the grounds that the motion was not originally addressed to this relief and that it would be prejudiced if not permitted to conduct appropriate discovery prior to such a motion.
As expressed in the memorandum decision, this court is concerned that this matter be speedily resolved so that the residents of the County of Queens obtain the benefits of an appropriate cable TV franchise as soon as possible. However, the role of a court in reviewing an application for a preliminary injunction is not to adjudicate the merits of the underlying action but rather, only to determine whether the plaintiff has established the requisite elements for the provisional remedy. (Swope v Melian, 35 AD2d 981.) Mindful of this role, the court did not reach the ultimate merits of the complaint in the original decision, expressly stating that is was unnecessary to consider some of the other procedural irregularities raised by the plaintiff. Consequently, it would be inappropriate on this motion for reconsideration, which is based upon the existing record, to address those issues now, nor would such a determination of the merits necessarily expedite this matter.
Accordingly, the request for summary judgment treatment is denied.
CONCLUSION
For the reasons assigned above, and having granted leave for reargument, the court, upon reconsideration, adheres to the determinations made in the memorandum decision, dated March 19, 1979.