In the Matter of JOHN W. BURKE, as Town Supervisor of the Town of Oyster Bay, et al., Petitioners, *v.* NEW YORK STATE PUBLIC SERVICE COMMISSION et al., Respondents.

Third Department, March 6, 1975.

*John F. O'Shaughnessy* (*Charles F. Lynch* of counsel), for Ralph G. Caso and another, petitioners.

*John M. Conroy* (*Dexter C. Reed* of counsel), for John W. Burke and another, petitioners.

*Adrian P. Burke, Corporation Counsel* (*Stephen P. Kramer* and *Gary Mailman* of counsel), for City of New York, petitioner.

*Peter H. Schiff* (*Charles R. Gibson* and *David Schechter* of counsel), for the New York State Public Service Commission, respondent.

*Davis, Polk & Wardwell* (*Lawrence E. Walsh, Guy Miller Struve* and *Henry H. Korn* of counsel), for New York Telephone Company, respondent.

SWEENEY, J. Prior to the turn of the century, the New York Telephone Company, or its predecessors, began to grant rate discounts to various municipalities for local telephone service. The present record reveals that they were originally offered to cities, villages and a few towns in exchange for consents to place underground and/or aerial equipment in the highways. Discounts were also given voluntarily and without such exchange to several other cities and villages. The discounts were not uniform, nor were the terms and conditions of discount agreements which were made with the various municipalities always the same. In 1910, article 5 was added to the Public Service Law whereby telephone corporations were made subject to regulation by the Public Service Commission. (L. 1910, ch. 673, § 3, eff. Sept. 1, 1910. ) Subdivision 4 of section 91 of that article specifically provides:

" 4. Nothing in this chapter shall be construed to prevent any telegraph corporation or telephone corporation from continuing to furnish the use of its lines, equipment or service under any contract or contracts in force at the date this article takes effect or upon the taking effect of any schedule or schedules of rates subsequently filed with the commission, as hereinafter provided, at the rate or rates fixed in such contract or contracts ".

By 1924 the telephone company attempted to establish a uniform municipal discount practice by initiating a 25% discount to all cities, villages and towns which were then receiving a discount. It was able to substitute in many cases this stand-

ard 25% discount for the nonstandard discount granted prior thereto. In other cases it was not able to do so. The standard discount was also extended to all cities and villages which thereafter applied therefor. According to the testimony of a telephone company representative, the reason for limiting a voluntary standard discount to the cities and villages was because the population growth and commercial concentration were then in the cities and villages. The discount was denied to town and county governments.

Petitioners Town of Oyster Bay and Nassau County, in June and November of 1971, respectively, filed applications with the telephone company requesting the standard municipal discount which were rejected. On November 16, 1971 the Public Service Commission, after receiving complaints from several towns and counties, ordered an investigation into the telephone company's practice of granting municipal discounts. At the time of this investigation discounts were in effect for all cities served by the company, for 272 of the 323 villages and for 5 towns.

After several hearings, the commission ruled the company's municipal discount policy unreasonably discriminatory against towns and ordered such practice terminated by a five-year phase out, except as to those municipalities contractually entitled to such discounts by virtue of agreements made prior to September 1, 1910. The commission also concluded that New York City's 25% discount, which had been granted in 1905, was voluntary and not based on a binding contract between the city and the company, and should, therefore, be eliminated over the five-year period.

The Town of Oyster Bay, the County of Nassau and the City of New York thereafter petitioned pursuant to article 78 to review this determination. All of the proceedings have been transferred here and consolidated by order of this court.

The Town of Oyster Bay and Nassau County agree that the company's denial of a municipal discount to towns and counties is unreasonably discriminatory. They contend that since such discrimination was found to exist, a 25% standard discount must be granted to them until such time as no municipality is receiving it. They maintain further that they are entitled to the discount retroactive to the date when applications for same were first made, and demand refunds for such period. We are of the opinion that the commission's denial of a standard discount to petitioners over the five-year phasing out period and refusal to order refunds for such discount retroactive to the date of application was warranted.

The commission's authority to implement its finding of unreasonable discrimination is found in subdivision 1 of section 97 which provides where pertinent: " Whenever the commission shall be of the opinion, after a hearing, had upon its own motion or upon a complaint that * * * the practices of any * * * telephone corporation affecting * * * [its] rates, charges, rentals or service are * * * unjustly discriminatory or unduly preferential or in anywise in violation of law * * * the commission shall * * * determine the just and reasonable rates, charges and rentals to be thereafter observed * * * notwithstanding that a higher or lower rate, charge or rental has been theretofore prescribed by general or special statute, contract, grant, franchise condition, consent or other agreement and shall fix the same by order * * * by which such rates, charges or rentals are thereafter to be observed. * * * Any such change in rate, charge or rental shall be upon such terms, conditions or safeguards as the commission may prescribe."

The record discloses that the general regulations concerning the telephone company's discount policy have never been filed with the commission. The municipal discounts are reductions from the applicable tariff rates. Therefore, no violation by the company of its tariff rates on file with the commission may be charged. Furthermore, the commission has not ordered the filing of appropriate tariff rates to reflect the gradual elimination of such discounts. It has ordered gradual elimination of the discounts only as to those municipalities which had been afforded such voluntary discounts, the majority of which having been in effect for several years. As to those municipalities, immediate withdrawal of the discounts would necessarily impose much hardship. The Town of Oyster Bay and Nassau County have never received such discounts. There could be, therefore, no reliance on a past practice by the company of allowing a discount, and, thus, no hardship. It was reasonable that the termination of the discounts as to those municipalities receiving same be postponed. We believe the financial impact on those cities and villages presently receiving the standard discount which would be caused by immediate and total abolishment of the discount requires the gradual elimination thereof. The commission had ample discretion to order the phasing out of existing discounts without requiring an extension of same to other municipalities during the interim.

Pursuant to subdivision 1 of section 97, the commission's power to determine the rates to be thereafter charged in a case

in which the practice affecting rates has been found to be unjustly discriminatory is prospective only. The commission was powerless to order refunds to petitioners for discounted service retroactive to date of application. We cannot attribute unreasonableness to the method adopted by the commission to eliminate the telephone company's discriminatory practice under its power of general supervision of telephone corporations.

New York City's challenge to the commission's decision involves unrelated issues. It contends, first, that the Public Service Commission exceeded its jurisdiction in purporting to adjudicate a contractual dispute between a regulated utility and one of its customers. It argues that whether or not it has a contractual right to a discount is a legal question properly resolvable only in a court of law. We do not agree. Once the legal issue has been raised and administratively resolved, adequate judicial review is available through article 78. In *Kovarsky* v. *Brooklyn Union Gas Co.* (279 N. Y. 304, 313) the Court of Appeals recognized that ''the Commission has * * * such judicial power as is incidental to the exercise of its other powers.'' Implicit in CPLR 7803 (subd. 3) is the Legislature's intent to permit agencies to rule on legal matters arising in the course of their regulatory duties. The exercise of the commission's power to prohibit unreasonable discrimination necessitated a resolution of the legal question as to whether a municipality's discount was based on a binding contract. In determining whether the Public Service Law had been violated and whether a continuation of the discount to the city would perpetuate such violation, this legal dispute was recognized and resolved by the commission, based on findings of fact. To require a trial *de novo* on the incidental legal question would be wasteful. (See *Matter of Public Serv. Comm. of State of N. Y.* v. *Norton,* 304 N. Y. 522.)

Next, we conclude that there is sufficient support in the record for the commission's determination that no contract existed between the City of New York and the telephone company requiring the latter to provide discounted service. The city failed to produce any evidence, documentary or otherwise, to support such a contract. Although the record contains several exhibits, consisting of petitions for franchise, letters containing offers, resolutions and ordinances, none of them contain a formalized agreement to furnish discounted telephone service to the city. The company offered to enter into an agreement with the city in 1906 whereby a 50% discount would have been granted if the city would agree not to franchise any other tele-

phone company. This offer, however, was not accepted. Proposals from other companies were thereafter entertained by the city. In 1911 the company was invited to renew its offer. In the meantime, the telephone article had been added to the Public Service Law and in view thereof the company countered with a willingness only to continue its 25% discount. Resolutions of the former Villages of Richmond Hill and Jamaica, which were later incorporated into the City of New York, granted franchises to predecessors of the company, but neither grant was conditioned on a discount being extended to that particular municipality. They merely provided that rates to the subscribers in the village were not to be in excess of rates charged to other subscribers. We also disagree with the city's contention that to have an adequate record the commission should have insisted that the company produce all relevant materials from its files. A diligent search of the telephone company's records was made and a company representative testified that no formal written agreements relating to discounted service between the company and the city were on file.

Finally, although conceding that it failed to prove a contractual right to a discounted rate for its telephone service, New York City maintains that the commission erred in denying its request for a subpoena duces tecum. The city requested that the company produce " all communications, documents, and contracts between [the New York Telephone Company], its predecessors and the City of New York and the former cities, villages and towns which comprise the City of New York." It based such request on " a strong possibility that there are, in fact, contracts granting telephone discounts " which could be found only in the possession of the company due to the disarray of its own files. The commission denied the subpoena primarily because a prior examination of the company's files had been afforded in which the city participated. It also noted that the city's request was submitted 12 days after the close of the record, thus failing to comply with the commission's rule (16 NYCRR 1.4) requiring applications for subpoenas duces tecum to be made at least five days prior to the opening of the hearing. Prior to the subpoena application the record had been reopened, once at the city's request for the introduction of additional evidence and again after the issuance of the commission's tentative opinion. We find no abuse of its discretion in the commission's refusal to issue the subpoena.

The determination should be confirmed, and the petitions dismissed, without costs.

HERLIHY, P. J. (concurring in part and dissenting in part). The record clearly establishes that the grant of a discount to cities and villages not having acquired any pre-1910 contractual rights to such discounts while refusing to grant the same consideration to other governmental subdivisions falling within the classification of municipalities constitutes discrimination. The conclusion of the Public Service Commission (hereinafter PSC) that such discrimination was prohibited by the provisions of subdivision 3 of section 91 of the Public Service Law appears to be a reasonable construction of the said statute and, accordingly, the PSC correctly held that such discrimination must be terminated.

In its wisdom and apparently because of the rising burden upon consumers generally in regard to increased rates which would be required to finance the grant of discounted rates to towns, the PSC determined that appropriate relief would be the denial of further discounts except for an interim period of adjustment to all cities and villages which had not acquired pre-1910 contractual rights to the discounts. While the method of equalization chosen by the PSC seems somewhat contrary to the public policy of this State in regard to a preference for reduced rates to municipalities as set forth in subdivision 3 of section 92 of the Public Service Law, the requirement of equality amongst the class can reasonably be construed as granting the PSC power to overcome the otherwise specific provisions of said subdivision 3 of section 92. Accordingly, we concur in the majority's determination insofar as relief is being denied to the Town of Oyster Bay and implicitly as to all municipalities not parties hereto and not having any pre-1910 contractual basis for discounted or reduced rates.

The City of New York has approached the proceedings herein in somewhat of a simplistic manner by insisting that the PSC did not have jurisdiction to determine whether or not the city had received its discounted or reduced rate pursuant to a contractual relationship entered into prior to 1910. In this regard, the position of the city is without any merit as is demonstrated in the majority opinion. Upon this proceeding the city appears to contend that it was denied a fair hearing because the PSC did not require a further and more extensive search of the records of the New York Telephone Company to determine whether or not there was a contractual relationship. In support of its desire for a remittal for the purpose of such a further search, the city concedes that the present record does not contain proof of a contractual right to the reduced rate. The limitation imposed

by the context in which the concession is made is apparently recognized by the majority opinion since it is found therein that the record does not contain proof of a pre-1910 contractual right to the reduced rate.

The substantial public interest involved in the city's right to a continuance of its reduced rate requires that the court disregard the seeming concession by the city and, in any event, the requirement that the PSC act in the public interest would require a review of the city's position upon the merits in regard to the existence of a pre-1910 contract.

It is academic that contracts may either be written or oral and may be expressed or implied in fact.

The present record does not establish any expression in words of agreement or promises by the city and the New York Telephone Company (hereinafter referred to as the Utility) in regard to a reduced rate for services, and thus we have no express agreement or contract either written or oral. However, the record establishes a contractual relationship between the city and the Utility. A contract is generally understood to be made up of an offer by one person to do something for either money or some other performance by another person and which is accepted by such other person. The record also establishes that prior to 1910 the city had telephone service provided by the Utility at a reduced rate of 25% and that such service has continued with the same reduction in general rate for nearly 50 years. Such facts establish a contract by implication arising from the conduct of the parties. (See, generally, *Allegheny Coll.* v. *National Chautauqua County Bank,* 246 N. Y. 369.) The evidence in this record tends to indicate that from the inception of the service provided by the Utility, it was the Utility that offered to provide the service at the reduced rate and the city accepted the service upon such terms. It is established that there was an offer by the Utility to provide services for a good and valid consideration which was accepted and thus the sole interpretation of the relationship is one of contract. The record establishes that the parties to this proceeding, including the PSC, have proceeded from the narrow point of view that unless it could be established that the city gave a franchise expressly upon the consideration of a reduced rate, there was no contract.

The Public Service Law does not in any way so restrict the search for a pre-1910 contract. Assuming, however, that it is important to find that the reduced rate was actually given in consideration of a franchise or governmental action on the part of the City of New York, the opinion of the Court of Appeals in

the case of *New York Tel. Co.* v. *Siegel-Cooper Co.* (202 N. Y. 502, 510) notes that the Utility in that case had stipulated "that the discount to the city of New York was allowed on account of its intimate relation to the plaintiff [Utility] through its control of streets and its power of regulation, ' as a contribution to the expense and cost to the government of the city of New York.' " In the *Siegel-Cooper* case the court went on to note that the Utility had received a franchise of immense value from the city for a small consideration. In the *Siegel-Cooper* case the court was not concerned with whether or not a contract actually existed between the Utility and the city for the reduced rate; however, the elements described therein clearly give rise to an implied contract arising from their conduct and which has now continued nearly 50 years. The present record tends to establish that the Utility was never under a legal obligation to either accept governmental services and a franchise or to grant a reduced rate. Obviously, it could have refused a franchise and, further, it could have refused to grant a reduced rate. However, the Utility did not choose to exercise the options of refusal, assuming such a demand had been made, but instead freely granted a reduced rate. Of necessity, it would appear that the Utility having appliances embedded in city streets and/or in city property which require services in the nature of traffic control while opening city streets or areas would be as much a burden upon the city today as it was in 1905 or at any time prior to 1910. The considerations then which essentially prompted the offer of a reduced rate are still being given by the city and the reduced rate was still being given by the Utility. While it can be argued that the city was duty bound to provide the services regardless of any reduced rate, it must be assumed that the reduced rate does provide an incentive to the city to promptly assist the Utility. Inasmuch as reduced rates for cities or municipalities were favored by the common law (see *New York Tel. Co.* v. *Siegel-Cooper Co., supra,* pp. 511–514) and are expressly permitted in subdivision 3 of section 92 of the Public Service Law, the currying of favor by grant of a reduced rate was not illegal or contrary to public policy.

For the foregoing reasons we conclude that the record establishes a contract between the city and the Utility consisting of an offer and acceptance based upon valid considerations on the part of both parties and which consideration was still being furnished by the city as of the time of the hearings in this proceeding. Additionally, the record establishes a pre-1910 contract by custom and usage. Accordingly, so much of the decision of

the PSC as finds that there was not a pre-1910 contractual relationship between the city and the Utility which could exempt the city's rate from the jurisdiction of the PSC is erroneous as a matter of law and fact.

The determination of the Public Service Commission should be annulled insofar as it found that the City of New York did not have a pre-1910 contract with the New York Telephone Company for a reduced rate.

KANE and MAIN, JJ., concur with SWEENEY, J.; HERLIHY, P. J., and LARKIN, J., concur in part and dissent in part in an opinion by HERLIHY, P. J.

Determination confirmed, and petitions dismissed, without costs.