NEW YORK FRUIT AUCTION CORPORATION, Respondent, v
CITY OF NEW YORK, Appellant.

First Department, June 11, 1981

### APPEARANCES OF COUNSEL

*Judah Dick* of counsel *(Leonard Koerner* with him on the brief; *Allen G. Schwartz, Corporation Counsel,* attorney), for appellant.

*Barrington D. Parker, Jr.,* of counsel *(Parker Auspitz Neesemann & Delehanty,* attorneys), for respondent.

MURPHY, P. J.

The City of New York moved at Special Term for an order dismissing the complaint for legal insufficiency (CPLR 3211, subd [a], par 7) and/or granting it summary judgment (CPLR 3212).

With regard to the first branch of the motion, the verified complaint of plaintiff New York Fruit Auction Corporation (Auction) contains four causes of action. The first cause, containing 20 paragraphs, is founded upon allegations of fraudulent misrepresentation. Auction asserts that for 33 years it had operated its fruit business, as a supplier and a distributor, on the Hudson River waterfront in lower Manhattan. In 1966 it considered relocating its business to New Jersey. However, the city, acting through its officials, agents, agencies, departments and employees (officials), represented to Auction that it intended to implement a plan to develop a modern, model food processing and distribution center at Hunts Point (the Center). The city gave Auction a comprehensive plan and a master plan which outlined the development of the Center. At that time, the Center and the surrounding area were purportedly depressed and blighted.

On November 1, 1968, Auction relied upon the city's representations and was induced to enter into a lease with the city. Pursuant to that lease, Auction built its executive offices and an auction facility in the Center. The first cause omits to state that the city then purchased the facilities from Auction. The latter then leased approximately 173,725 square feet at a cost in excess of $4.50 for a period of 20 years.

Auction avers in that first cause that the city's representations with regard to the Center were false and that it never intended to develop that site. As a direct result of the city's failure to develop the area as planned, Auction was allegedly required to pay rents far in excess of the fair market value of the leased premises. Auction states that it has no adequate remedy at law.

The 20 paragraphs in the first cause are incorporated in and serve as a predicate for the remaining three causes.

In the second cause, Auction alleges that if the actions of the city and its officials do not constitute actual fraud, then they constitute negligent misrepresentation. The third cause is also pleaded in the alternative. It is alleged therein that the facts, as pleaded, are alleged to show mutual mistake and/or innocent misrepresentation of a material fact. In the fourth cause, Auction seeks a judgment declaring that the lease as a whole, with particular reference to the rent provisions, is unconscionable, as that term is used in section 235-c of the Real Property Law. It is, therefore, alleged to be unenforceable.

Under the first, second and third causes, Auction sought rescission of the lease or reformation of it. Damages were also requested under those causes. Auction asked for a declaration under the fourth cause that the lease was unconscionable and unenforceable under section 235-c of the Real Property Law. It also sought that a limitation be placed upon the agreed rent in order to avoid an unconscionable result.

Upon a motion brought under CPLR 3211 (subd [a], par 7), the complaint is deemed to allege whatever can be implied from its statements by fair intendment (*Kober v Kober*, 16 NY2d 191, 193). However, where a cause of action is based upon misrepresentation, fraud or mistake, the circumstances constituting the wrong must be stated in detail (CPLR 3016, subd [b]). Therefore, an action for reformation or rescission, founded upon fraud, mistake or other cause enumerated in CPLR 3016 (subd [b]), will be dismissed for legal insufficiency if the complaint does not allege the particular facts warranting equitable relief (*Harrington v Tracy*, 258 App Div 853; *Mahoney v Schiller*, 202 App Div 776). The complaint in this proceeding is fatally deficient because it does not specify the city's officials who purportedly misrepresented the facts and/or made a mistake in presenting the true facts to Auction. Likewise, no factual details are pleaded as to the time and place of these encounters with the city's officials. Since Auction was required to plead and prove that it had the right to rely upon the authority of those particular city officials (*Emerman v City of New York*, 34 AD2d 901), the complaint should have specified these very im-

portant facts. In view of these most critical omissions, the complaint fails to state a cause of action. Therefore, the branch of the motion under CPLR 3211 (subd [a], par 7) must be granted.

The second branch of the motion under CPLR 3212 must be denied as academic in the absence of a legally sufficient complaint. Had the merits of the case been considered, the court would grant the motion for summary judgment for the following reasons.

The supporting affidavits submitted by the city provide many relevant background facts. The original lease covered an area of $15\frac{1}{4}$ acres; the improvements were to contain 175,000 square feet of commercial and industrial space. Auction completed the construction at the Center on or about July 1, 1971. The city reimbursed it with the sum of $7,789,923.25 for construction costs. Auction was to pay an annual rent of 9% of the actual construction cost plus an annual ground rent of $111,587 to cover the city's costs of land acquisition and site preparation.

The lease was amended on January 19, 1973 to include an additional one-quarter acre to the site. This first amendment also provided for the construction of an additional railroad siding track, which was to be amortized by a rent of 9.4% of the construction cost. The ground rent was increased to $113,500 per year.

On May 30, 1974, Auction wrote a letter complaining that its rent was not comparable to rents charged at the Bronx Terminal Market and certain other competitive sites in New York and New Jersey. On August 9, 1974, the parties executed their second amendment to the lease. This second amendment lowered the rent for the first three years of the lease from 9% to $8\frac{1}{4}$%. Auction was to pay a rent of $8\frac{1}{2}$% during the fourth through the tenth years of the term and a 9% rental for the remaining ten years. The annual ground rent was set at $109,787. It should be emphasized that the original lease and the two amendments were approved by the Board of Estimate prior to execution.

The city's attorneys pointed to the following language in paragraph EIGHTH of the lease: "Lessee acknowledges that the premises which are the subject of this Lease are

part of a food processing and distribution center being developed by Lessor at Hunts Point in the Borough of the Bronx, City and State of New York. An over-all plan for the design of said food processing and distribution center is being prepared for Lessor by a coordinating designer, which plan will contain architectural and engineering specifications for all improvements to be constructed in said center. Lessee agrees that all improvements to be made pursuant to this Lease, including but without limitation thereon, buildings, roads, streets and utilities, shall conform to said specifications and that prior to the commencement of construction, all engineering and architectural plans shall be submitted to the coordinating designer and shall be subject to his approval". However, they contended that the lease was not conditioned upon the city's performance under the Bechtel Master Plan for the Center. At most, the Bechtel Master Plan was the plan for the ultimate development of the area at a future date. It was conceded that certain portions of the Bechtel Master Plan had been realized and that other portions had not been completed. The unsuccessful projects were allegedly the result of various causes, particularly the insolvancy of the lessees.

Auction's president and chairman, Reid, submitted an affidavit in opposition to the motion. Suffice it to say that he simply reiterated and expanded upon the basic charges in the complaint. Reid made no attempt to detail the circumstances surrounding the alleged acts of misrepresentation and/or mistake nor did he identify the unnamed city officials involved in the occurrences.

The record would warrant a grant of summary judgment upon the following grounds. These grounds are more directly addressed to the first three causes, and by incorporation, to the fourth cause.

First, Auction failed to lay bare its proof naming the city's officials who made the misrepresentations and/or the mistakes. As was mentioned above, Auction did not demonstrate that it had a right to rely upon those unnamed officials (*Emerman v City of New York*, 34 AD2d 901, *supra*). Moreover, under the then existing charter provisions, it was necessary for the Board of Estimate to approve

every project tentatively proposed under the Bechtel Master Plan. (Charter of City of NY, § 67, subd 1; former § 1303, subd 2, par [f] [now § 704, subd (g)].) This lack of proof upon the essential facts underlying the first three causes would justify the grant of summary judgment on those causes.

Second, the Bechtel Master Plan could not serve as a basis for either deliberate, negligent or unintentional misrepresentation because it was merely a presentation of predictions and expectations with regard to the development of the Center. *(Bailey v Diamond Int. Corp.*, 47 AD2d 363, 366.) The general rule in this area has been succinctly stated in New York Jurisprudence (vol 24, Fraud and Deceit, § 43, pp 77-78) : "It is the general rule that fraud cannot be predicated upon statements or representations which involve mere matters of futurity or things to happen or to be done in the future. A misrepresentation as to a fact not yet in existence, or as to something that has not happened or occurred, but which is merely a misrepresentation as to a future event that may or may not occur, can form no basis of actionable fraud, but the false representation, in order to constitute such fraud, must relate to some material past or existing fact. While great expectations often prove disappointing, they do not prove fraud".

The Bechtel Master Plan was a general design for the future development of the Center. While Auction might have optimistically expected that the general design would be fully effected, it was aware that its relocation to the Center was a business venture with concomitant risks. Even though the city required Auction, under paragraph EIGHTH of the lease, to submit all plans to the co-ordinating designer for his approval, this provision was inserted with the hope rather than a guarantee of fulfillment. It is for this reason that this court has already found that the Bechtel Master Plan could not serve as the basis for a misrepresentation claim *(Guthartz v City of New York*, 66 AD2d 707). To the extent that the first, second and third causes are explicitly founded upon misrepresentation, they are without merit, and summary judgment of dismissal would be awarded *pro tanto* to the city.

In passing, it should be observed that the foregoing analysis assumed the fact that the "over-all plan" mentioned in paragraph EIGHTH of the lease is the Bechtel Master Plan. The lease was executed on November 1, 1968; the Bechtel Master Plan is dated May, 1968. Since the Bechtel Master Plan was in existence on the date of execution, the parties could have referred to it by name, as was done in the *Guthartz* lease executed on December 21, 1973. The apparent reason that the Bechtel Master Plan was not mentioned by name in the subject lease is that the "over-all plan" was still "being prepared" at the time of execution. At that early stage in the development, both parties realized that changes might be made in the fundamental designs and plans for the Center. Hence, the "over-all plan" cannot be definitely equated with the Bechtel Master Plan in view of the fact that the plan had not been accepted as final by both parties in November of 1968.

Third, there is no evidence in the record to demonstrate that the parties made a mutual mistake as to the factual or legal significance of the Bechtel Master Plan. Both parties viewed it as a guide for future development; they did not look upon it as an integral part of the lease. *(Guthartz v City of New York, supra.)* Consequently, summary judgment would also be granted to the city upon the portion of the third cause referring to mutual mistake.

Fourth, the parol evidence rule precludes any evidence to establish that the Bechtel Master Plan was part of the parties' leasing arrangement. Where parties have reduced their agreement to writing, the parol evidence rule operates to exclude evidence of any prior oral or written agreement, or of any contemporaneous oral agreement when offered to contradict, vary, add to or subtract from the terms of the writing. (Richardson, Evidence [10th ed], § 601, p 598.)

In *Guthartz (supra)*, the lease contained provisions that (i) it was the entire agreement between the parties and (ii) modifications thereof were prohibited unless in writing. With these provisions in focus, this court found that the parol evidence rule barred any evidence as to the misrepresentations since they were promissory in nature *(Guthartz v City of New York, supra)*.

The subject lease does not contain the two provisions set forth in the *Guthartz* lease. Nonetheless, any attempt by Auction to prove that the Bechtel Master Plan was integrated into the lease would so vary the lease as to be violative of the parol evidence rule. Moreover, a matter of such controlling importance would normally have been incorporated in the lease. The parol evidence rule constitutes another ground upon which accelerated judgment would be granted to the city had the second branch of the motion been considered upon the merits.

It should be noted that "merger" or "integration" clauses do not ordinarily prevent a party from showing fraud in the inducement (24 NY Jur, Fraud and Deceit, § 236, p 317). However, that principle is inapplicable in this case because, as was explored above, the city did not make any fraudulent misrepresentation with regard to the Bechtel Master Plan. Thus, the parties' rights and obligations are controlled by the clear language in the lease, as amended.

The fourth cause seeks a judgment declaring the lease to be unconscionable under section 235-c of the Real Property Law. The viability of the fourth cause is dependent upon the merits accorded the prior three causes. In light of the fact that those earlier causes have been found devoid of merit, no declaration favorable to Auction would be made under the fourth cause. Furthermore, Auction has not come forward with any proof to show that the rentals charged under the lease were unconscionable or in any way unreflective of the rental market. *(Euclid Ave. Assoc. v City of New York*, 64 AD2d 550.) No proof was offered to demonstrate that lower rents were being charged at competitive sites in New York and New Jersey. No proof was submitted to indicate that Auction was operating its business at a loss or that greater profits could be attained at a different site. On the contrary, the record otherwise shows that the lease was negotiated at arm's length and that both amendments were advantageous to Auction. For these collective reasons, a declaration would be made under the fourth cause that the rent formulae under the lease, as amended, are not unconscionable.

Many other defenses are latent in the record although those defenses are not formally raised by the city. For example, it became evident during the 1970's that all the projects listed in the Bechtel Master Plan would not reach fruition. By obtaining the advantageous amendments and by continuing to accept the benefits of the lease after obtaining knowledge of the alleged fraud, Auction waived its right to seek relief upon that ground (24 NY Jur, Fraud and Deceit, § 252). So, too, the doctrine of laches precludes any relief for rescission or reformation since Auction, with knowledge of the city's alleged wrongdoing, failed to take any legal action until 1979. (6 NY Jur, Cancellation and Reformation of Instruments, §§ 21, 51.)

Accordingly, the order of the Supreme Court, New York County (TIERNEY, J.), entered March 10, 1980, denying the city's motion under CPLR 3211 (subd [a], par 7) and 3212 without prejudice to renewal upon completion of discovery, should be modified, on the law, by granting the branch of the motion to dismiss the complaint under CPLR 3211 (subd [a], par 7), and by denying the branch of the motion under CPLR 3212 as academic, and as modified, it should otherwise be affirmed, without costs.

KUPFERMAN, BIRNS, MARKEWICH and FEIN, JJ., concur.

Order, Supreme Court, New York County, entered on March 10, 1980, modified, on the law, by granting the branch of the motion to dismiss the complaint under CPLR 3211 (subd [a], par 7), and by denying the branch of the motion under CPLR 3212 as academic, and as modified, affirmed, without costs and without disbursements.