OPINION OF THE COURT
Alfred H. Kleiman, J.
This motion to dismiss opens yet another chapter in the seemingly endless saga of New York City’s attempt to bring cable television to the Borough of Queens. Once again the principal parties involved in Orth-O-Vision v City of New York (101 Misc 2d 987 [Sup Ct, NY County 1979]) are before this court. Mr. Alfred Simon, the vice-president of Starburst Realty, is also the principal of Orth-O-Vision, Inc. And once again the court must decide serious and novel issues of law: whether local community boards and the public at large were adequately involved in the award of cable television contracts and the role of the New York State Commission on Cable Television in determining such issues.
First, however, a brief review of the Orth-O-Vision decision (supra), along with the subsequent history of the franchising process for cable television in Queens, is necessary.
Like the case at bar, Orth-O-Vision v City of New York (supra) was a taxpayer action maintained under General Municipal Law § 51. Plaintiff there alleged that a franchise contract between the city and Knickerbocker Communications Corporation for a cable television system in Queens was illegal due to noncompliance with certain provisions of the New York City Charter. Specifically, City Charter § 368 (a) requires a public hearing before the Board of Estimate on a petition for franchise and section 371 mandates a further public hearing before the Board on the proposed final contract. Sections 366-a (b) and 197-c, the Uniform Land Use Review Procedure (ULURP) Charter amendments adopted by referendum in 1975, provide that any proposal respecting the use of real property subject to city regulation shall be reviewed by the community boards of the districts in which the land use will occur and that county’s borough board.
In a thorough opinion by my respected colleague, Justice Bentley Kassal, the Orth-O-Vision court held that the alleged illegalities in the Knickerbocker agreement were the proper *179 subject of a taxpayer’s action under the General Municipal Law. The court also found that a cable television franchise involved the use of real property subject to the city’s control thus necessitating local community board review under ULURP. Knickerbocker’s proposed franchise had not been subjected to ULURP review. The court further found that certain terms of the franchise contract with Knickerbocker, as ratified, differed in a material and substantial way from the terms set forth in the petition for franchise which was the subject of the public hearing before the Board of Estimate pursuant to section 368 (a). The court therefore held that the plaintiff had demonstrated a clear likelihood that it would succeed in showing at trial that the contract was illegal and granted the application for a preliminary injunction barring construction on a Queens cable system by Knickerbocker.
Following the injunction, steps were taken to correct the defective proceedings and an accelerated ULURP process began. Cable television for Queens seemed close at hand. But while the community board hearings took place, the city, pursuant to a provision in the injunction order which was consented to by Knickerbocker, changed course and began accepting new proposals for the Queens franchise. On March 24, 1980, the Board of Estimate approved a new "Request for Proposals” (RFP) which set down the minimum standards the city expected for the Queens system. Proposals were received from, among others, Warner-Amex Cable Communications Company of Queens and American Cablevision of Queens, defendants in the present action (hereinafter cable defendants) and Queens Inner Unity Cable Corporation, the third cable company named in plaintiff’s complaint. Queens Inner Unity did not join in the motion presently before this court.
The cable defendants’ proposals were reviewed by the community and borough boards pursuant to ULURP in late 1980 and early 1981 and the Board of Estimate held the public hearing mandated by Charter § 368 (a). Then, in April 1981, the Board of Estimate issued a supplemental information request (SIR) revising the standards set down in the 1980 RFP. The various applicants, including cable defendants, responded with new proposals by July 1, 1981. Further public hearings were held before the Board and its cable working group committee but no more ULURP hearings took place before the community boards. The three defendants named in this suit were targeted for further negotiation in December 1981. The Board held a public hearing on the proposed con *180 tracts on June 21, 1983, and the Mayor approved the adopted agreements and executed the franchise contracts for Queens on July 19, 1983.
The contracts were then reviewed by the New York State Commission on Cable Television as required by Executive Law § 821. The Commission held a public hearing of its own on August 30, 1983, and issued certificates of confirmation on December 16, 1983.
To date, the Borough of Queens is still without cable television.
On May 9, 1984, plaintiff Starburst Realty commenced this taxpayer’s action pursuant to General Municipal Law § 51 seeking a declaration that the franchise agreements entered into between the City of New York and cable defendants are illegal, null and void and further seeking to enjoin defendants from constructing any cable television systems. Plaintiff’s supplemental complaint sets forth what this court will treat as seven distinct "causes of action”, although the complaint does not refer to them as such. Two allege that substantial and material differences between the requests for proposals and the final contracts, and between the supplemental information requests and the final contracts, render the contracts invalid. One alleges fraud on the part of the cable defendants and various city officials. Two allege noncompliance with the franchise procedure provisions of the City Charter § 368 (a) and the ULURP. Two allege that the final contracts were improperly amended.
Defendants now move under CPLR 3211 (a) (7) to dismiss the complaint for failure to state a cause of action or in the alternative for summary judgment under CPLR 3212. The motion is addressed to the entire complaint and sets out two basic arguments.
I.
Defendants’ threshold contention is that plaintiff lacks standing to sue under General Municipal Law § 51. Section 51 allows actions "to prevent any illegal official act * * * or to prevent waste or injury to * * * any property, funds or estate of * * * [the] municipal corporation”. Defendants argue that plaintiff does not complain of an "illegal official act” or official "waste” within the meaning of the statute. I find, however, that plaintiff’s allegations raise more than a simple disagreement with public officials on a matter of public policy (cf. *181 Talcott v City of Buffalo, 125 NY 280 [1891]). Aside from fraud, plaintiff alleges fundamental illegalities in the contracts and that these illegalities would result in a detriment to the city through a waste of its funds and/or imminent and possible irreparable public injury (Altschul v Ludwig, 216 NY 459 [1916]; Kaskel v Impellitteri, 306 NY 73 [1953]). Also confronted with this issue, the Orth-O-Vision court (101 Misc 2d 987, 991, supra) concluded: "The franchise and contract here, if illegal, would permit the opening and use of city-streets without proper authority, and, as such, would constitute a trespass to city property and a public nuisance which may be prevented by a taxpayer’s action. (Blanshard v City of New York, 262 NY 5, 10-11.)”
The holding of Mesivta of Forest Hills Inst. v City of New York (58 NY2d 1014 [1983]), relied upon by defendants, is not to the contrary. There the New York City Board of Education failed to specify in detail, as required by statute, its reason for reacquiring and remodeling a former school building and the cost thereof. The court held that "[a] failure to observe these statutory provisions does not constitute the fraud or illegality necessary to support a taxpayer action pursuant to section 51.” (Supra, at p 1016; see, Kaskel v Impellitteri, supra, at p 79.) Plaintiff here, however, alleges a significantly higher level of illegality and waste, all within the contemplation of the statute. (See, Altschul v Ludwig, supra.)
I therefore hold that plaintiff does have standing to sue as a taxpayer pursuant to General Municipal Law § 51 and has adequately alleged the elements of such an action.
II.
The heart of defendants’ motion is their contention that plaintiff’s suit presents questions over which the New York State Commission on Cable Television (hereinafter Commission) had exclusive jurisdiction and that therefore plaintiff’s sole judicial remedy would have been a timely CPLR article 78 proceeding challenging the certificates of confirmation issued by the Commission for the franchises involved. Defendants actually put forth two closely related but alternative theories to support this argument.
The first is that the Commission effectively made a determination on the issues raised by plaintiff. Thus, defendants argue that there exists a fundamental difference between this case and Orth-O-Vision (supra): "In that case, the cable fran *182 chise contracts had not been confirmed by the State Cable Commission, and there had been no administrative opportunity to raise the claim of material deviation between the responses to the RFP which were processed under ULURP and the contracts. The instant case * * * raises issues which the State Cable Commission has necessarily determined.” (Defendant city’s supplemental memorandum of law, p 3.)
The Commission was created pursuant to Executive Law article 28 and given broad power to regulate the cable television industry in this State. (See, Matter of City of New York v State of New York Commn. on Cable Tel., 47 NY2d 89, 92 [1979].) With some exceptions here irrelevant, no cable system may operate in New York State without Commission certification. Executive Law § 821 (3) states that the Commission shall issue a certificate unless it finds "that operation of the proposed cable television system by the applicant under the proposed franchise would be in violation of law, any regulation or standard promulgated by the commission or the public interest.” The certificates issued here state in part that the Commission has determined "that the franchise and the operation of the proposed cable television system is in full compliance with applicable law.” Defendants contend that the certificates therefore "constitute — by statutory provision — conclusive evidence that the contracts have been awarded in compliance with law and that they are in the public interest.”
Defendants rely completely on the language of section 821 (3), and the language of the certificates themselves, to support the notion that the certificates are evidence relevant to the issues raised by plaintiff in this action; they nowhere maintain that the Commission actually undertook specific review of any provisions of the City Charter, or anything else relevant to plaintiffs allegations. In fact an affidavit submitted by the Chairman of the State of New York Commission on Cable Television states that plaintiff never raised before the Commission the issues presented in this action. I cannot agree that simply because the certification process offered plaintiff, or anyone else, an opportunity to complain of illegalities in the franchise contracts, the certificates therefore become evidence that the Commission actually made findings on any specific allegations. Nor do the certificates constitute "conclusive evidence” as to the legality of the franchises. Neither the certificates nor the statute support such presumptions.
Defendants’ reliance on Matter of Burke v New York State Public Serv. Commn. (39 NY2d 766 [1976], affg 47 AD2d 91 [3d *183 Dept 1975]), holding that a trial de novo on an issue already resolved by the Public Service Commission would be wasteful, is misplaced. There, the Public Service Commission made findings of fact and specifically adjudicated the issue in question; here the Cable Commission made no specific findings relevant to plaintiffs allegations.
Defendants’ alternative contention is essentially that the Commission need not have specifically reviewed plaintiffs allegations because the Commission’s own regulations on franchising procedure effectively preempt those of the City Charter. Thus, defendants would have the court read plaintiffs allegations, at least those that rely on the Charter provisions, as a collateral attack on the Commission certificates. The Commission does maintain its own regulations entitled "Franchising Procedures” (9 NYCRR part 594). But any comparison or contrast between the City Charter provisions and the Commission regulations must be read in the context of Executive Law § 819 (3) which states: "Nothing in this article shall be construed to prevent franchise requirements in excess of those prescribed by the commission, unless such requirement is inconsistent with this article or any regulation, policy or procedure of the commission.”
Specifically, plaintiff alleges, inter alia, noncompliance with City Charter §§ 368 (a) and 197-c (ULURP) in that the final franchise agreements are materially and substantially different from the proposals reviewed under these sections. The Charter provisions are certainly "in excess of’ the applicable Commission regulation mandating only a single public hearing before the legislative body of the municipality (9 NYCRR part 594), and defendants do not contend that these provisions are inconsistent with Commission policy per se. They argue only that should these sections be read to require a new set of hearings on material changes in a cable television franchise agreement, those provisions are in fact inconsistent with Commission policy. Defendants cite the following 1979 statement of the Commission rejecting a proposed rule change: "Consistent with our policy to encourage municipalities to freely negotiate with their prospective franchisees, we have deleted another proposed rule change. Our proposal would have required municipalities to notify the Commission prior to the signing of a franchise agreement if the proposed franchise agreement differed materially from the application for the franchise submitted by the successful applicant. We anticipate that many such situations will occur and we now believe that *184 it is not necessary for us to be apprised of such changes before the franchise agreement is signed.” (Defendant city’s affidavit, para 37.)
As discussed hereinafter, I hold that material alterations of franchise agreements, made subsequent to the local review mandated by the Charter, render that review legally insufficient. As a practical matter such alterations result in resubmission of the agreements, as altered, for review pursuant to the Charter. I perceive no inconsistency between such an interpretation of the Charter and the Commission "policy” quoted above. Requiring public review of material changes in a proposed cable television franchise in no way impinges upon the free negotiation of franchise agreements. The fear of never-ending rounds of review is unwarranted. The Charter provisions themselves leave much room for, and indeed contemplate, negotiation and alteration of franchise agreements after the mandated review. (Blanshard v City of New York, 262 NY 5 [1933]; Loos v City of New York, 257 App Div 219 [2d Dept 1939]; Tompkins Bus Corp. v La Guardia, 156 Misc 651 [Sup Ct, NY County 1935].) Only when such alterations materially and substantially change the proposals reviewed is the contract illegal. The legal standard as to what constitutes such a material change is high. (See, Loos v City of New York, supra; Tompkins Bus Corp. v La Guardia, supra; Orth-O-Vision v City of New York, 101 Misc 2d 987, supra.)
Should negotiation after the mandated review require a material change in a cable television franchise agreement, there is nothing particularly onerous or burdensome in requiring the city to submit those changes to the community boards of the affected districts for review. Because the Commission does not require notice of material changes in franchise agreements does not mean local community boards should not be notified. These City Charter provisions were tailored to the unique demographics and political structure of New York City.[1]
I find the Charter provisions at issue are not preempted by Commission regulations because they are "franchise requirements in excess of those prescribed by the Commission” and are not inconsistent with Commission policy (Executive Law § 819 [3]). Since these provisions go beyond Commission regulations, and the Commission did not review compliance with *185 them, it follows that the certificates of confirmation issued by the Commission are not evidence that the contracts were awarded in compliance with the Charter.
Accordingly, the fact that plaintiff did not challenge compliance with City Charter provisions before the Commission is not a bar to this taxpayer’s action under General Municipal Law § 51. Nor does the fact that plaintiff might have pursued an article 78 proceeding in which it could have raised the same issues mean that such a proceeding was his exclusive remedy. (Bloom v Mayor of City of N. Y., 35 AD2d 92 [2d Dept 1970]; Orth-O-Vision v City of New York, supra, at p 992.) The holding of BusTop Shelters v City of New York (99 Misc 2d 198 [Sup Ct, NY County 1978]), cited by defendants, is not to the contrary, as it stands only for the proposition that an article 78 proceeding "is an appropriate remedy” to review a resolution of the Board of Estimate adopting a request for proposals, not the sole remedy. As was stated in Bloom (supra, at p 97), "[w]e should not observe nice lines of distinction in characterizing the manner in which the relief is sought”.
Finally, and most importantly, Executive Law § 821 (9) itself states: "Nothing in this section shall be deemed to validate a franchise not granted in accordance with law * * * No confirmation under this section shall preclude invalidation of any franchise illegally obtained.” Thus, even though the Commission may issue certificates of confirmation, an illegally obtained franchise may be challenged without challenging the actions of the Commission itself in an article 78 proceeding. Merely to assert, as do defendants, that section 821 (9) refers only to an article 78 proceeding is simply to state an unsupported conclusion. If the Legislature had in mind only an article 78 proceeding, section 821 (9) would hardly have been necessary since such a proceeding would be available without explicit statutory authorization. As the city itself points out, the Commission would be a necessary party to an article 78 proceeding. A salutary effect of section 821 (9) is to make it unnecessary to join the Commission as a party to suits addressed to issues not specifically raised before it. Such is precisely the case here.
Therefore, this court will not dismiss the complaint because plaintiff did not pursue an article 78 proceeding.
III.
Since the motion to dismiss was addressed to the complaint *186 as a whole, it would ordinarily be denied because, as detailed below, plaintiff made out what are essentially three valid causes of action. However, defendants’ motion papers request summary judgment in the alternative. All parties were thus provided adequate notice that the court might consider summary judgment and papers sufficient for such treatment were submitted. (CPLR 3211 [c]; 3212 [b]; Amaducci v Metropolitan Opera Assn., 33 AD2d 542 [1st Dept 1969]; cf. Mink Hollow Dev. Corp. v State of New York, 87 Misc 2d 61, 63-64 [Ct Cl 1976].) This court also recognizes a need to pare down this complex matter for trial. Therefore, the court will treat the motion as one for summary judgment to the extent of consideration of the validity of each of what the court denominates as plaintiff’s several causes of action. (CPLR 3212 [e].)
THE RFP AND SIR ALLEGATIONS
Plaintiff’s first "cause of action” alleges that the final franchise agreements vary materially and substantially from certain minimum standards set forth in the requests for proposals (RFP) for the Queens franchise adopted by the Board of Estimate. There exists no legal requirement in the City Charter or elsewhere that the final contracts must conform to the original RFP. The request for proposal process differs significantly from competitive bidding; in the latter process, the city concedes that it may not waive material standards set out in the advertisement for bids. Competitive bidding seeks standardization so that cost is the sole determining factor in the award of a contract. The RFP process, on the other hand, contemplates more flexibility and allows a municipality to choose between varying proposals. (See generally, Matter of Citiwide News v New York City Tr. Auth., 121 Misc 2d 536, 537 [Sup Ct, NY County 1983], revd on other grounds 99 AD2d 1026, revd 62 NY2d 464, 469 [1984]; Radicone v Davis, NYLJ, June 22, 1982, pp 6-7, cols 5, 2.)
These allegations are not to be confused with those based on the City Charter (below) or that set forth by plaintiff in Orth-O-Vision (101 Misc 2d 987, supra), under City Charter § 368 (a). The Orth-O-Vision court was concerned with material and substantial differences between the final contract and the proposal subject to public hearing. However, there is apparently no legal impediment precluding the city from holding public hearings on proposals which do not meet standards set down in an RFP. The only relevant comparison is therefore *187 between the proposal(s) actually subjected to public hearing and the final contract, not between the RFP and the final contract. Accordingly, plaintiff fails to state a cause of action on this ground.
Plaintiffs second "cause of action” alleges that the final contracts vary materially and substantially from standards set down in the supplemental information request issued by the Board of Estimate. As with the RFP, no legal basis exists for requiring the contracts to conform to standards set in the SIR as opposed to the responses to the SIR which may or may not have been subject to public hearing. Plaintiff fails to set forth a cause of action as to this allegation.
THE FRAUD ALLEGATION
Plaintiffs third "cause of action” alleges that the cable defendants’ proposals contained representations concerning their intentions and ability to build a cable system, and the feasibility of the construction and operation of their proposed cable systems, which were false and fraudulent and further that defendant city officials forwarded these proposals to the local community boards knowing the representations were false and fraudulent. Allegations of fraud must be set forth in detail. (CPLR 3016 [b]; New York Fruit Auction Corp. v City of New York, 81 AD2d 159 [1st Dept 1981].) The same rules of pleading applicable to any other action apply to taxpayers’ suits. (Sengelaub v Town of Smithtown, 29 Misc 2d 655, 660 [Sup Ct, Suffolk County 1961].) The allegation here does not specify the representations to which it refers nor to any other particulars. The allegations are bald and conclusory and clearly fail to satisfy the statutory requirement of detail.
ALLEGATIONS CONCERNING THE CITY CHARTER
Plaintiffs fourth "cause of action”, to the extent that it does not allege fraud, alleges that the cable defendants, acting in concert with defendant Morris Tarshis, the city’s Director of Franchises, negotiated agreements with the city which violated the City Charter, that the final franchise agreements were not presented to the community boards for ULURP review and that the ULURP review which did take place was legally insufficient due to material differences between the proposals reviewed and the final contracts.
I accept the basic premise set down in Orth-O-Vision (supra) and countenanced in Loos v City of New York (supra) that *188 should the petition for contract, upon which the public hearing mandated by City Charter § 368 (a) was held, differ materially and substantially from the final contract, then the public hearing was legally insufficient. Furthermore, I find that this principle should apply as well to ULURP review. Should the final franchise agreements vary materially and substantially from the proposals reviewed by the community boards and the borough board, the local review would have been meaningless. The Orth-O-Vision court, although not directly confronted with the issue, commented: "the public policy expressed in the charter amendments [ULURP] makes it even more imperative that any important variations between the contract and the original franchise petition be directly exposed to community boards” (supra, at p 1009).
Plaintiff here alleges a material difference in that the community boards, the borough board and the Board of Estimate reviewed proposals for binding agreements to construct cable systems but that certain subsequently negotiated contract terms condition cable defendants’ obligations upon a showing of economic feasibility and that therefore the obligations imposed in the final contracts are nonbinding. Plaintiff points to section 3.1 of the contracts[2] which reads: "The Company shall construct, operate, and maintain the System as a State-of-the-Art Broadband Communications Facility offering the full range of services, facilities and equipment that can reasonably and economically be made available through such a facility, as provided in Appendix A to this agreement.” (Emphasis mine.)
Appendix A, entitled "System Characteristics and Technical Performance/Testing Requirements” sets out in detail the technical specifications of the cable systems including a list of the "Subscriber Services” to be offered, such as "Leased Access” and "Handicapped Access,” and other features such as "Parental Control Devices.” Section 1.36 of the contracts defines "State-of-the-Art” as, "that level of technical performance or capacity * * * which has been developed and demonstrated to be workable and economically feasible and viable from time to time throughout this agreement.”
Plaintiff maintains that the plain language of these provi *189 sions means that the reference to economic feasibility applies to essentially all of cable defendants’ contract obligations and that therefore the Queens cable contracts impose no binding obligation to provide services, facilities and equipment according to contract specifications. He construes the above clauses as an escape hatch which will allow cable defendants to avoid obligations, such as the subscriber services specified in appendix A, which they find too costly.
The municipal defendants, on the other hand, contend that the above-quoted clauses do not render the contract obligations nonbinding. They argue that the cable defendants are bound, without reference to economic feasibility, to the specifications of appendix A, which are "the minimum technical requirements of the system”. They maintain that appendix A "defines the current state of the art,” whereas the economic feasibility language of section 3.1 "looks toward the future state of the art.” They therefore argue that the "State-of-the-Art” clauses at issue are limited to future obligations to upgrade the systems in accordance with technological advances and that economic feasibility is a necessary consideration.
Determining whether plaintiff states a "cause of action” on his allegations concerning the economic feasibility provisions requires judicial construction of the contract provisions in question. If plaintiff’s interpretation were found to be correct, and it were further found that the community boards, borough board and Board of Estimate reviewed proposals promising the specifications of appendix A unconditionally, a material difference would exist. In this light, the economic feasibility provisions would be more than mere "terms and conditions” of the contract; they would have fundamentally altered the proposals. (Cf. Tompkins Bus Corp. v La Guardia, 156 Misc 651, supra; Loos v City of New York, 257 App Div 219, supra.) If, as the city argues, the cable defendants’ present obligations under the contracts are binding and the economic feasibility provisions are addressed only to future maintenance, plaintiff’s allegations on these grounds would fail.
I find that the language of section 3.1 is ambiguous to the point that I cannot resolve as a matter of law whether the economic feasibility provisions are applicable to the specifications of appendix A. Put differently, it is not at all clear from the language of the agreement whether the specifications in appendix A fall under what the municipal defendants denominate "present” or "future” state-of-the-art and whether there *190 fore those "minimum technical requirements of the system” are conditioned on economic feasibility. Indeed, the economic feasibility provisions may be construed to apply to certain specifications of appendix A and not to others. In that case a determination would have to be made as to whether the extent to which they do apply constitutes a material and substantial change from proposals reviewed pursuant to the City Charter provisions.
The ambiguities of this agreement cannot be resolved without a trial before a finder of fact at which the parties may submit parol and other extrinsic evidence "of their intent at the time of contracting”. (Newin Corp. v Hartford Acc. & Indem. Co., 62 NY2d 916, 919 [1984].) Without such trial, the true intent of the contracting parties cannot be discerned. Although the cable defendants joined the motion before this court, they submitted no supporting papers of their own, and chose to rely completely upon the arguments and papers of the municipal defendants. Thus, their understanding of the clauses in question remains unclear and only a trier of the facts can "pass * * * on the credibility of the extrinsic evidence and whatever inferences reasonably could be drawn therefrom”. (Sutton v East Riv. Sav. Bank, 55 NY2d 550, 554 [1982].) The meaning of the clauses in question and the intent of the contracting parties must be determined in order to resolve issues which are the valid subject of this taxpayer’s action.
As to material variations, plaintiffs only other allegation of merit concerns section 20.11 of the final contracts which requires franchisees to extend their system to any area of the city in which a previously awarded franchise has been terminated but only upon the condition that such extension is economically feasible and promises "reasonable profitability.” Plaintiff argues that this provision varies materially and substantially from proposals submitted to the community boards and borough board which did not condition cable defendants’ obligation to extend their franchises on "reasonable profitability.” The difference alleged by plaintiff would, if proven, indeed be material, but the precise content of the proposals reviewed is not forthcoming from the papers before me. Accordingly, plaintiff has raised a triable issue of fact as to whether the condition of "reasonable profitability” as to the cable defendants’ obligation to extend their systems was adequately presented to the community and borough boards.
*191 ALLEGATIONS CONCERNING THE AMENDMENT
A
Plaintiffs fifth "cause of action” alleges that in 1984 the Board of Estimate approved certain amendments to the contracts with cable defendants without submitting the amendments to the local community boards as required by ULURP. City Charter § 197-c provides:
"a. Except as otherwise provided in this charter, proposals and applications by any person or agency for changes, approvals, contracts, consents, permits, or authorization thereof, respecting the use, development or improvement of real property subject to city regulation shall be reviewed pursuant to a uniform review procedure in the following categories * * *
"(6) Franchises and revocable consents involving residential, commercial * * * or community facility projects”.
This cannot be read to mean every contract amendment must be subjected to ULURP review. But a proposal to revise a franchise agreement which revision would materially and substantially alter the land use implications of the franchise as previously reviewed must be considered a "proposal * * * for changes * * * respecting the use, development or improvement of real property”. At any rate, an amendment may be a material or substantial alteration of a proposal, as discussed above, thus triggering municipal charter provisions calling for public hearings. (See, Matter of Huntington TV Cable Corp. v State of New York Commn. on Cable Tel., 61 NY2d 926, 929 [1984].)
In essence, the 1984 amendment allows the cable defendants to meet their obligation to provide a minimum of 70 subscriber channels by March 1987, by the use of a single cable instead of with two cables if, by March 1987, technology is available for such a single cable, and the company decides to use it. Plaintiff argues that this creates a risk that cable defendants will choose to use this allegedly unproven technology and install a single cable which might then prove inadequate or unworkable. Thus, in March 1987, there could result serious land use implications, such as the reopening of the streets for the laying of new cable. Plaintiff further alleges that for technical reasons the single cable will prove unworkable in the vicinities of Kennedy and La Guardia Airports. Plaintiff also maintains that should the cable defendants opt for the single cable, the cable system would have a maximum of 70 channels instead of a minimum of 70. Again, I cannot *192 resolve as a matter of law whether or not this amendment constitutes a material and substantial change in the contract. Resolution of the factual issues raised will require the guidance of expert opinion.
Accordingly, I find plaintiff has raised a triable issue of fact as to whether the amendment granting cable defendants the option to use the single cable materially alters the contract. I note, however, that the relief available on this "cause of action” pertains only to the amendment, not the entire contract.
B
Plaintiff’s sixth and seventh "causes of action,” allege that in March 1984, the Board of Estimate approved the amendment allowing a single cable in violation of Commission regulations requiring a public hearing with reasonable notice and that subsequent efforts to cure this procedural deficiency were invalid. Plaintiff does not contest the fact that the Board of Estimate eventually did, in December 1984, approve the amendment at a public hearing preceded by adequate public notice. Nothing prohibits the Board of Estimate from curing prior deficiencies in this fashion. (See, Matter of Huntington TV Cable Corp. v State of New York Commn. on Cable Tel., 94 AD2d 816, 819 [3d Dept 1983].) Plaintiff fails to state a cause of action as to these allegations.
LEAVE TO REPLEAD
At the end of his affidavit in opposition to defendants’ motion, plaintiff asks leave to replead the fraud allegations should this court find them insufficient on their face. The pleadings are not defective due merely to inartful draftsmanship. (Cf. Metro Envelope Corp. v Westvaco, 72 AD2d 695 [1st Dept 1979].) Keeping in mind the higher statutory standard for pleading fraud, as well as the voluminous evidence submitted by plaintiff, including plaintiff’s lengthy answers to defendants’ interrogatories, this court is not satisfied that plaintiff demonstrated good grounds for alleging fraud. (CPL 3211 [e].) Accordingly, leave to replead is denied.
CONCLUSION
In determining this motion I am held to a lesser standard than was Justice Kassal in Orth-O-Vision (101 Misc 2d 987, supra), who decided an application for a preliminary injunc *193 tion and thus determined that plaintiff there had shown "a clear likelihood of success.” I expressly do not make such findings, and hold only that triable issues of fact have been raised.
The municipal defendants maintain that this action was instituted to abet the private business interests of plaintiff’s vice-president. Even assuming this were true, this court is restricted to resolving the legal issues raised in this taxpayer’s action, regardless of plaintiff’s motives. But this decision again recognizes that, should the trial court determine that material variations between the petitions and the final contracts exist, the public policy expressed in the City Charter — that the community boards must fully participate in the franchise process — must be adhered to. The people of Queens deserve cable television but also deserve the Charter’s protection insuring their input into the franchise process.
Motion for summary judgment is granted to the extent set forth herein, otherwise denied.

. A detailed outline of the history and purpose of ULURP appears in Orth-O-Vision v City of New York (101 Misc 2d 987, 997-999, 1001-1005).

. This court has reviewed only the franchise agreement, including appendix A, but not appendices B-M, between the city and Queens Inner Unity. I accept the representation of the municipal defendants that the form of the city’s agreements with Warner-Amex and American Cablevision does not materially vary.