STARBURST REALTY CORP., Respondent-Appellant, v CITY OF NEW YORK et al., Appellants-Respondents.

First Department, February 24, 1987

### APPEARANCES OF COUNSEL

*Edward N. Costikyan* of counsel *(Paul, Weiss, Rifkind, Wharton & Garrison,* attorneys), for Warner Amex Cable Communications Company of Queens, appellant-respondent.

*Robert D. Joffe* of counsel *(Cravath, Swaine & Moore,* attorneys), for American Cablevision of Queens, Inc., appellant-respondent.

*Stephen P. Kramer* for City of New York and others, appellants-respondents.

*Robert L. Beerman (Barry A. Wadler* with him on the brief), for respondent-appellant.

### OPINION OF THE COURT

MILONAS, J.

Plaintiff Starburst Realty Corp. commenced the instant taxpayer's action pursuant to General Municipal Law § 51 challenging the award of certain cable television franchises covering the Borough of Queens. On June 10, 1985, the municipal and cable company defendants moved under CPLR 3211 to dismiss the complaint for failure to state a cause of

action or, in the alternative, for summary judgment under CPLR 3212.

In an order entered on February 28, 1986, the Supreme Court dismissed all of the claims but two, the fourth and fifth causes of action (131 Misc 2d 177). According to plaintiff, as alleged in the two remaining causes of action, (1) there was no compliance with the "two-hearing requirement" of New York City Charter §§ 368 and 371; and (2) the Uniform Land Use Review Procedure (ULURP) contained in New York City Charter § 197-c was violated. Specifically, plaintiff asserts that modifications in the final contracts between the City of New York and the cable companies were material and substantial, thereby requiring that they be resubmitted for review by the local community boards and the City Planning Commission, and the failure to do so rendered the contracts illegal. The changes cited by plaintiff are the following:

(1) The proposal considered by the local boards states that: "The Company shall undertake any construction and installation as may be necessary to keep pace with the latest developments in the state of the art whether with respect to increasing channel capacity, furnishing improved converters, instituting two-way services, or otherwise."

The language in the final version reads: "The Company shall construct, operate and maintain the system as a State-of-the-Art Broadband Communications Facility offering the full range of services, facilities and equipment that can reasonably and economically be made available through such a Facility".

(2) The second alteration in the contracts involves the obligation to extend service beyond the franchise area. In the proposal examined by the local boards, the city could order the franchisee to construct and operate a system beyond the franchise district if no such system had been awarded through competitive bidding. This provision was ultimately changed so that the city could direct the franchisee to deliver service outside of its district if "economically feasible and viable" allowing the franchisee to "derive a reasonable profit therefrom". Plaintiff contends that the change in wording is material since it transforms a binding commitment to build a cable system into a sham contract by which the cable companies could decide not to construct the system. Moreover, an amendment to the contracts, made after they were initially executed, permits the use of a single cable rather than two cables, thus affecting the channel capacity of the system.

The attempt to bring cable television to Queens has a history dating back to 1976 when the Knickerbocker Communication Corporation submitted a petition to enable it to construct a closed circuit cable system in that county. In order to evaluate the petition and to comply with the mandates of the State Cable Commission, the city issued in 1977 a formal request for proposals inviting interested applicants to submit plans. Several responses were duly received, including one from Orth-O-Vision, Inc., and Knickerbocker Communications, Inc. The Board of Estimate subsequently decided to award a franchise to Knickerbocker. However, prior to the approval of the contract by the Mayor, Orth-O-Vision instituted a taxpayer's action seeking to enjoin implementation of the agreement on the ground that there was a lack of compliance with ULURP. The court ultimately ruled in favor of plaintiff therein *(Orth-O-Vision v City of New York, 101 Misc 2d 987)*, and Knickerbocker's contract was sent back for an expedited ULURP review as provided in the Judge's order. While the reconsideration was underway, the city received a number of new proposals from applicants who had not previously expressed an interest. As a result, the city determined to reopen the Queens franchise process, and on March 24, 1980, the Board of Estimate authorized issuance of a new request for proposals.

Ten proposals were studied, among them were the ones submitted by defendant companies, or predecessors of defendants, and Orth-O-Vision, Inc., plaintiff's firm. Each petition and response to the request for proposals was forwarded to the local community boards and borough boards for review under ULURP. Hearings were conducted, and then the boards sent their recommendations on to the City Planning Commission, which, in turn, approved the proposals and forwarded them to the Board of Estimate. The Board of Estimate held two days of public hearings in March of 1981, at the conclusion of which a "supplemental information request" was solicited from the applicants. Their responses were thereafter distributed to the members of the Board of Estimate, the Cable Television Working Group (established by the Board of Estimate in 1980 to supervise the franchise process) and the State Cable Commission and were made available for public inspection. In October of 1981, the Washington, D.C., law firm of Arnold & Porter, the Board's cable television consultant, in conjunction with Price Waterhouse & Company and Atlantic Research Corporation, produced a report evaluating the applicants'

responses. There was another public meeting on November 18, 1981, at which time the Cable Working Group suggested that the Board of Estimate concentrate on seven applicants and also recommended standards for negotiating final contracts.

The Board of Estimate again held a public hearing on December 10, 1981 on the subject of cable television. The franchise applicants, including the vice-president of plaintiff's company, spoke at the hearing. At the conclusion of the hearing, the Board, by unanimous vote, targeted particular applicants for further negotiations and adopted guidelines. Plaintiff's company, Orth-O-Vision, was not among the companies selected. Drafts of the proposed agreements between the city and the successful applicants were open for public review in January of 1983, and, on May 13, 1983, the Cable Working Group released to the public the proposed final contracts by publishing them verbatim for 15 days in the City Record pursuant to New York City Charter § 371. The last public hearing on the matter was conducted on June 20, 1983. The proposed agreements were discussed, and the chosen applicants accepted the terms contained therein. On June 30, 1983, the Board of Estimate approved the franchise agreements for the four boroughs, and the Mayor executed them on July 19, 1983.

On August 8, 1983, following public notice, the State Commission on Cable Television convened its own public hearings on the proposed contracts. The agency approved them in October of 1983, subject to certain conditions, and issued certificates of confirmation on December 16, 1983, which state that "the franchise and operation of the proposed cable television system is in full compliance with applicable law." Although the 1983 agreements specified that two cables were to be used in order to provide the required minimum 70 channels, it was, the city asserts, subsequently learned that advanced technology would soon enable single cables to accommodate 70 channels and, at the same time, reduce the cost of construction. Therefore, the Director of Franchises requested the Board of Estimate to amend the contracts to allow the franchisees, if they so desired, to utilize the new technological developments. On March 15, 1984, the Board, after public notice and a public hearing, adopted a resolution permitting the cable companies to satisfy their 70 channel obligation by installing one cable rather than two.

The instant action was commenced in May of 1984 prior to the Mayor's having approved the amendment. However, the

companies involved, seeking to clarify the uncertainty regarding the one cable-two cable controversy, submitted a formal petition for the amendment, which was published in accordance with New York City Charter § 368 (a). A public hearing ensued, and the terms of the proposed modification were then published. Another hearing followed on January 10, 1985. The Mayor accepted the amendment on January 28, 1985, and the State Cable Commission gave its approval on March 13, 1985.

As previously noted, the Supreme Court dismissed all but two of plaintiff's seven causes of action. The first two claims asserted the existence of material differences between the final contracts and the terms of both the request for proposals and the supplemental information request issued by the city. In dismissing these claims, the court found that there is no legal requirement that the ultimate contracts conform to the original request for proposals or to the supplemental information request. The third cause of action was dismissed on the ground that plaintiff's allegation of fraud was conclusory and lacked particularity. After denying defendants' motion to dismiss the fourth and fifth claims, the court went on to determine that the sixth and seventh causes of action were defective since the Board of Estimate had ultimately cured the inadequate public notice asserted by plaintiff.

In declining to dismiss the fourth and fifth causes of action, the Supreme Court concluded that a question of fact exists as to the meaning and intent of the differences between the proposals and the final agreements, that these variations cannot be ascertained from the text of the documents themselves and that a trial on that issue is, consequently, necessary. Defendants have appealed from the court's order to the extent that it did not dismiss the complaint in its entirety (although plaintiff filed a cross appeal from that portion of the order dismissing the other claims, the cross appeal has been abandoned), urging that:

(1) the proper method to dispute the award of the contracts herein was through a proceeding pursuant to CPLR article 78 and not by means of a taxpayer's action;

(2) the New York City Charter does not preclude the Board of Estimate from making significant and material changes in contracts after they have already undergone community board scrutiny, or, alternatively;

(3) even if final franchise agreements may not materially vary from the initial proposals, the revisions herein are not,

in fact, significantly dissimilar from those outlined in the original versions and, therefore, do not have any land impact such as would render them subject to ULURP review.

In my opinion, defendants are substantially correct on all three points.

General Municipal Law § 51, entitled "Prosecution of officers for illegal acts", provides in pertinent part that: "All officers, agents, commissioners and other persons acting, or who have acted, for and on behalf of any county, town, village or municipal corporation in this state, and each and every one of them, may be prosecuted, and an action may be maintained against them to prevent any illegal official act on the part of any such officers, agents, commissioners or other persons, or to prevent waste or injury to, or to restore and make good, any property, funds or estate of such county, town, village or municipal corporation".

Defendants contend that while the statute is phrased in the disjunctive and appears to authorize suit either where there is an "illegal official act" or "to prevent waste", in fact, courts have repeatedly held that the law is not a vehicle for correcting technical or procedural irregularities by governmental bodies, citing *Mesivta of Forest Hills Inst. v City of New York* (58 NY2d 1014), *Kaskel v Impellitteri* (306 NY 73), *Southern Leasing Co. v Ludwig* (217 NY 100), *Talcott v City of Buffalo* (125 NY 280), *Di Paola v City of Glen Cove* (21 AD2d 678, *lv dismissed* 14 NY2d 954). Plaintiff, however, relies upon other cases *(Blanshard v City of New York,* 262 NY 5; *Loos v City of New York,* 257 App Div 219; *Yonkers R. R. Co. v City of Yonkers,* 214 App Div 479; *Orth-O-Vision v City of New York,* 101 Misc 2d 987, *supra)* in support of the proposition that a taxpayer's action may be maintained to set aside a franchise which has been awarded in contravention of proper statutory procedure. In that regard, it should be noted that there is little recent appellate authority with respect to this issue.

In *Orth-O-Vision v City of New York (supra),* decided in 1979 and clearly involving a challenge similar to the one in question here, a Supreme Court Justice declared (at p 991) that:

"Where, as here, the acts are claimed to be illegal, the plaintiff must establish that the illegality tends to 'the detriment of the city either by the dissipation of its funds or by the threat of other injury so imminent and substantial as to make it proper that the taxpayers be protected by injunction' * * * The franchise and contract here, if illegal, would permit the

opening and use of city streets without proper authority, and, as such, would constitute a trespass to city property and a public nuisance which may be prevented by a taxpayer's action * * *

"Accordingly, for the purposes of this phase of the motion [motion for preliminary injunction, cross motion to dismiss the complaint], I find that the complaint sufficiently alleges the elements of a taxpayer's action".

Yet, in a 1983 memorandum *(Mesivta of Forest Hills Inst. v City of New York, supra)*, the Court of Appeals, quoting from *Kaskel v Impellitteri (supra,* at p 79), stated that an action pursuant to General Municipal Law § 51 "lies 'only when the acts complained of are fraudulent, or a waste of public property in the sense that they represent a use of public property or funds for entirely illegal purposes' " (at p 1016). Although the dispute in *Mesivta* did not concern the granting of a franchise but the purported noncompliance by defendant with a provision of the Education Law, the court held that the "failure to observe these statutory provisions does not constitute the fraud or illegality necessary to support a taxpayer action pursuant to section 51. To hold otherwise 'would subject the discretionary action of all local officers and municipal bodies to review by the courts at the suit of the taxpayers, a result which would burden the courts with litigation, without increasing the efficiency of local administration' " *(supra,* at p 1016). Notwithstanding the fact that the Court of Appeals did not elaborate on what is meant by the words " 'for entirely illegal purposes' ", it does appear that the court took the position in *Mesivta* that a taxpayer's suit is not available simply to review a determination made in violation of supposedly unlawful procedures.

The Board of Estimate regularly considers numerous special permits, land dispositions, leases and zoning amendments which must be reviewed by community boards and the City Planning Commission under ULURP. Thus, to make a taxpayer's suit available to challenge Board of Estimate actions such as the one before us here could severely impede the conduct of public business. Certainly, any question regarding the legality of the procedures utilized by the Board can properly and expeditiously be resolved by means of a CPLR article 78 proceeding. Since plaintiff has not asserted any valid fraud claims and the only remaining causes of action involve an alleged failure by the city to follow various provisions of the New York City Charter, plaintiff should appropri-

ately have instituted an article 78 proceeding. While CPLR 103 (c) would ordinarily allow conversion of the instant action into such a proceeding, the litigation herein was not commenced until well after the expiration of the Statute of Limitations applicable to article 78 proceedings.

■ Even assuming, however, that a taxpayer's action is appropriate, plaintiff's fourth and fifth causes of action should still have been dismissed. The statutory scheme establishing community boards and authorizing nonbinding recommendations on the part of those boards does not preclude the ultimate adoption of contracts containing different, even substantially different, terms from those found in the proposals originally considered under ULURP. According to New York City Charter § 366-a, a petition for a franchise shall be reviewed by a community board or borough board in the manner prescribed by section 197-c and shall be limited to the land use impact. Indeed, section 197-c specifically provides that the community board examine each "proposal or application", as distinct from the "proposed contract and resolution" which falls within the purview of the Board of Estimate. (NY City Charter §§ 370, 371.)

Under New York City Charter § 371, it is the duty of the Board of Estimate to publish in the City Record in the manner provided therein the text of the proposed contract and resolution and a notice of a public hearing, together with the place where copies of the proposed contract and resolution may be obtained. Moreover, section 2800, which describes the functions of the community boards, states that they shall exercise the "initial review of applications and proposals" of public agencies and private entities involving land use or development (subd [15]). It is the Board of Estimate, however, which has the "final authority respecting the use, development and improvement of city land." (NY City Charter § 67 [4].)

It is evident that the procedure set forth in the New York City Charter for the award of franchises contemplates a system which enables local communities to offer their reasoned input while, at the same time, vesting the ultimate authority in the hands of the Board of Estimate so as to permit the degree of flexibility necessary in the contract-negotiating process. In addition, the City Planning Commission is expressly empowered to "approve, modify, or disapprove" the proposals reviewed by the community planning boards. (NY City Charter § 197-c [e]; *see also, Margulis v Lindsay,* 31 NY2d

167; *Matter of Lower E. Side Joint Planning Council v New York City Bd. of Estimate,* 83 AD2d 526, *affd* 56 NY2d 717, which upheld subsequent modifications of urban renewal plans.) As the Court of Appeals recently explained in *Matter of Jackson v New York State Urban Dev. Corp.* (67 NY2d 400, 425), a case in which plaintiffs sought a new environmental impact statement with regard to the Times Square redevelopment project: "A requirement of constant updating, followed by further review and comment periods, would render the administrative process perpetual and subvert its legitimate objectives. ' "If upon the coming down of the [administrative] order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening" ' ".

Finally, the issue here is not so much whether or not the actual agreements between the cable companies do, in fact, vary substantially and materially from the original proposals studied by the community boards, but whether the modifications adopted can be deemed to have land use implications. The reason is that the New York City Charter provides for the ULURP review of franchise petitions solely when they relate to land use impact. New York City Charter § 197-c describes 10 situations in which land use is clearly a factor, such as changes in the city map; designations of zoning districts or special permits pursuant to a zoning resolution; site selection for capital projects; franchises and revocable consents involving residential, industrial, commercial or community facility projects; improvements in real property the costs of which are payable other than by the city; housing and urban renewal projects; landfills; and the sale, lease, exchange or other disposition of certain real property and the acquisition, sale or lease of land under water. Section 197-c also contains a catchall provision which states that the ULURP shall apply as well to "[s]uch other matters involving the use, development or improvement of property as are specified by the board of estimate upon recommendation of the city planning commission" (§ 197-c [a] [11]).

It may be true that, in practice, the city has not always limited submissions to the community boards to matters which strictly concern land use. This does not mean that the city is, consequently, required to consult the local boards in

other than land use situations because they have done so in the past. Certainly, it is difficult to perceive how contract language referring to economic feasibility, the addition of which words is complained of by plaintiff, can have land use impact. Similarly, the alteration in the provision relating to the extent of the cable companies' obligation to construct a system beyond the franchise area has *economic* rather than land use implications. In authorizing the city to direct the franchisee to deliver service outside of its district where "economically feasible and viable", the purpose seems to have been to increase the likelihood that the cable companies in question will be able to meet their financial obligation to build the extension.

The modification of the contract permitting the use of a single cable rather than two cables also has no discernible land use implications. Although community boards apparently did consider as one of the original proposals the installation of one cable with possible future upgrading through the utilization of a second cable, the fact is that the number of cables does not affect land use of the sort contemplated by New York City Charter § 197-c. Street openings are not the same as land use and are not subject to ULURP. In fact, New York City Charter § 2903 (c) (3) and (5) vest responsibility for the opening of streets with the Department of Transportation; and, insofar as the local districts are concerned, all that is mandated before a street may be opened is that written notice be filed "at least ten days in advance of the intended action with the construction coordinator and consulting engineer for the borough in the office of the borough president and the office of district manager for the community district in which the street, road or highway is located." (NY City Charter § 86.) Provision is also made in the event of an emergency situation.

Thus, for all of the foregoing reasons, the Supreme Court should have dismissed the fourth and fifth causes of action.

Accordingly, the order of the Supreme Court, New York County (Alfred H. Kleiman, J.), entered on or about February 25, 1986, which, *inter alia,* denied defendants' motion for summary judgment dismissing plaintiff's fourth and fifth causes of action, should be modified, on the law, to the extent of granting defendants' motion for summary judgment dismissing the fourth and fifth causes of action, and otherwise affirmed, without costs or disbursements.

SANDLER, J. P., SULLIVAN, FEIN and WALLACH, JJ., concur.

Order, Supreme Court, New York County, entered on or about February 25, 1986, unanimously modified, on the law, to the extent of granting defendants' motion for summary judgment dismissing the fourth and fifth causes of action, and otherwise affirmed, without costs and without disbursements.